JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

ALLSTATE INSURANCE COMPANY

Rec't
114671

**DEFENDANTS**

A. EARLINE FOLSOM

B-01-020

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Martin J. Phipps (210) 344-0500
ADAMI, GOLDMAN & SHUFFIELD, INC.
9311 San Pedro, Suite 900
San Antonio, TX 78216

ATTORNEYS (IF KNOWN)

United States District Court
Southern District of Texas
FILED

JAN 3 0 2001

Michael N. Milby
Clerk of Court

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of
Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
(For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Declaratory Judgment—no coverage under insured's homeowner's policy.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus: | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 28 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $ _____

Check YES only if demanded in complaint
JURY DEMAND: ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

/ui/ljg/23100578/dec.pet2
MJP/coa

United States District Court
Southern District of Texas
**FILED**

**JAN 3 0 2001**

**Michael N. Milby
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. **B - 01 - 0 2 0** |
| | § | |
| A. EARLINE FOLSOM | § | |
| | § | |
| DEFENDANT. | § | NON-JURY |

## PLAINTIFF'S ORIGINAL PETITION
## FOR DECLARATORY JUDGMENT

Plaintiff ALLSTATE INSURANCE COMPANY ("Allstate"), respectfully requests this Court to interpret the liability coverage provided by a homeowner's policy. Further, Allstate respectfully requests this Court to declare that Allstate has no duty to defend or indemnify Defendant, A. EARLINE FOLSOM, and that there is no coverage provided in connection with a suit presently pending against A. EARLINE FOLSOM. In support of this complaint, Allstate shows:

### A.   PARTIES & SERVICE OF PROCESS

1.     Allstate is an insurance company duly organized and existing under the laws of the State of Illinois and authorized to issue homeowners insurance policies in the State of Texas. Allstate's principal place of business is Northbrook, Illinois.

2.     Defendant A. Earline Folsom ("Folsom") is an individual who resides at 2101 Treasure Hills No. 413, Harlingen, Cameron County, Texas  78550-8715.  Service by the Cameron County Sheriff's Office is requested at this time.

CutePDF - www.tssla.com

## B.    VENUE & JURISDICTION

3.    Pursuant to 28 U.S.C. § 1332 (West 1998), jurisdiction is proper in this Court due to complete diversity of citizenship between Allstate and Folsom. Specifically, Allstate is an entity incorporated in the State of Virginia and Folsom is a resident of Texas. In addition, the amount in controversy exceeds $75,000 exclusive of interest and costs. Furthermore, venue is proper in the Southern District of Texas, Brownsville Division, because Folsom resides in Cameron County, which is within the Brownsville Division of the Southern District of Texas.

## C.    FACTUAL BACKGROUND

4.    Allstate issued a homeowners policy to Folsom, Policy No. 036538431, a true and correct copy of which is attached hereto as Exhibit "A" and incorporated by reference. This policy is a standard Texas homeowners condominium policy, providing liability coverage with a per occurrence limit of $300,000.00. (Exhibit "A").

5.    Folsom has requested a defense under this policy with respect to a lawsuit that has been filed against her. Allstate is currently providing such defense under a reservation of rights. The policy states that Allstate will provide a defense and pay up to the limit of liability damages when a claim:

> is made or a suit is brought against an <u>insured</u> for damages because of <u>bodily injury</u> or <u>property damage</u> caused by an <u>occurrence</u> to which this coverage applies.

(Exhibit "A"). The policy defines the relevant terms. Specifically, the policy defines "bodily injury" as "bodily harm, sickness or disease. This includes required care, loss of services and death that results." (Exhibit "A"). The policy goes on to define "occurrence" as "an

accident, including exposure to conditions, which results in <u>bodily injury</u> or <u>property damage</u> during the policy period." (Exhibit "A").

6.      In Section II, the policy provides exclusions to the liability coverage sought by Folsom. (Exhibit "A"). First, the policy provides that it excludes coverage for liability arising from an insured's business pursuits, stating "<u>bodily injury</u> or <u>property damage</u> arising out of or in connection with a <u>business</u> engaged in by an <u>insured</u>. But this exclusion does not apply to activities which are ordinarily incidental to non-business pursuits." (Exhibit "A"). Second, the policy provides that it excludes coverage for liability arising from the intentional acts of the insured, stating that "<u>bodily injury</u> or <u>property damage</u> which is caused intentionally by or at the direction of the <u>insured</u>" is not covered. (Exhibit "A").

## D.      THE UNDERLYING SUIT

7.      Folsom is a member of the Board of Trustees of the Marine Military Academy ("MMA") in Harlingen, Texas. In her official and individual capacity, Folsom was named as a defendant in a lawsuit was brought against the MMA, several MMA instructors, and the MMA Board of Trustees by several former MMA cadets and their parents ("MMA Plaintiffs"). On March 2, 2000, the MMA Plaintiffs filed their Thirteenth Amended Original Petition, Cause No. 97-11-7227-E, in the 357th District Court, Cameron County, Texas ("the underlying suit"). A true and correct copy of Plaintiff's Thirteenth Amended Original Petition from the underlying suit is attached as Exhibit "B" and incorporated herein by reference. In the underlying suit, the MMA Plaintiffs allege that they were intentionally abused and mistreated at the hands of MMA instructors and fellow cadets. (Exhibit "B").

8.      The underlying suit involves over fifty-three (53) plaintiffs and brings a large number of allegations against the MMA, two individual MMA instructors, and the MMA Board of Trustees.  (Exhibit "B").  The MMA Plaintiffs bring numerous allegations of abuse and mistreatment against the MMA and its instructors, including but not limited to, negligent supervision of fellow cadets resulting in physical and sexual abuse of the MMA Plaintiffs and negligent misrepresentation of the quality of education and environment provided at MMA. (Exhibit "B").

9.      While the majority of the allegations are aimed at the MMA and the named instructors, the MMA Plaintiffs allege that the Board of Trustees were negligent in failing to follow recommendations set out by a self-study program and negligent in supervising its employees.  (Exhibit "B):

> 121.      All Defendants, including the Trustees on the Board, were negligent in failing to follow the recommendations of the Self-Study performed by Defendant MMA, including its officers and trustees, which specifically recommended that MMA "provide additional Drill Instructor assistance to enhance overall supervision of Cadets throughout the [sic] each day."  MMA, its staffs, officers, and Trustees also disregarded the recommendations of the SACS committee after their visit in April of 1994, which specifically recommended assistant Drill Instructors, so the D.I.s could have some form of "Off Time." The committee stated the assistant drill instructors "can also assist in providing a quiet environment for rest between the hours of 2200-0600."  Therefore, Defendant MMA and the Board of Trustees, are liable for the acts or omissions of its Drill Instructors and other staff because of their negligence in not providing more supervision and under the doctrine of Respondeat Superior.

(Exhibit "B").

CMPDF - www.fenrir.com

10.     Further, the underlying suit brings a blanket allegation against all MMA Defendants, stating that "the actions of these Defendants have intentionally inflicted emotional distress upon the Plaintiffs." (Exhibit "B").

11.     As a result of the acts alleged on the part of the MMA, its instructors, and its Board of Trustees, the MMA Plaintiffs claim to have suffered severe physical and emotional damages, requiring past and future medical attention. (Exhibit "B"). For the acts of the MMA, its instructors, and Board of Trustees, the MMA Plaintiffs seek to recover actual and exemplary damages. (Exhibit "B").

### E.     DUTY TO DEFEND & INDEMNIFY

12.     Under the policy in question, Allstate is not obligated to provide a defense or indemnity payments for suits falling outside of the policy's liability coverage. The policy's insuring agreement states that Allstate will provide a defense and pay damages for claims of "bodily injury" or "property damage" arising from covered losses. (Exhibit "A"). A claim for "bodily injury" or "property damage" is covered only if it arises from a policy-defined "occurrence." The allegations regarding Folsom in the underlying suit do not constitute an "occurrence" as defined by the policy. Specifically, the allegations regarding Folsom's "failure to follow the recommendations of the Self-Study" do not constitute "an accident, including exposure to conditions, which results in bodily injury or property damage during the policy period." (Exhibit "B"; Exhibit "A").

13.     Further, even if the allegations constitute "bodily injury" arising from an "occurrence" as defined by Folsom's policy, the allegations regarding Folsom fall squarely within two of the policy's exclusions. First, all allegations brought against Folsom, as a member of the MMA Board of Trustees constitutes regard a "business pursuit" and consequently, coverage for liability arising from such acts is excluded by specific policy language. (Exhibit

-5-

CMsPDF - www.fesive.com

"A"). Any acts or omissions on the part of the Board of Trustees is clearly a business pursuit of Folsom, and therefore, Allstate owes no duty to defend Folsom in the underlying suit.

14.     Second, this policy contains an express exclusion for "bodily injury or property damage which is caused intentionally by or at the direction of the insured." (Exhibit "A"). The petition in the underlying suit alleges that all MMA Defendants intentionally inflicted mental distress on the MMA Plaintiffs. (Exhibit "B"). Therefore, all factual allegations asserted in the underlying suit establish that the damages complained of are the result of intentional conduct, and are expressly excluded by the policy at issue.

15.     The allegations contained in the underlying suit clearly negate coverage, and therefore, Allstate owes no duty to defend Folsom in this case. The cost of defense would be a sum in excess of the minimum jurisdictional limits of the Court. Additionally, as the allegations regard non-covered claims, Allstate has no obligation to pay any part of any judgment that may be rendered against Folsom.

## F.     REQUEST FOR DECLARATORY RELIEF

16.     Allstate seeks a declaration from this Court, pursuant to 28 U.S.C. § 22.01, that there is no duty to defend or indemnify and that there is no coverage under the policy on the grounds that the underlying suit is not within the coverage afforded by the policy. Further, Allstate requests that the Court declare that because Allstate has no duty to defend Folsom in the underlying suit, it may withdraw the defense it is currently providing to Folsom under a reservation of rights.

## G.     ATTORNEY'S FEES

17.     Allstate has retained the firm of Adami, Goldman & Shuffield, Inc. to represent it in this action and has agreed to pay the firm reasonable and necessary attorney's fees. An award of reasonable and necessary attorney's fees to Allstate would be equitable and just and, therefore,

-6-

authorized by Section 37.009 of the Texas Civil Practice & Remedies Code.

WHEREFORE, PREMISES CONSIDERED, Allstate requests that Folsom be cited to appear and answer and that upon final trial, Allstate have the following:

A.      A declaration that Allstate owes no duty to defend Folsom in the underlying suit;

B.      A declaration that Allstate does not have a duty to pay any judgment rendered in the underlying suit;

C.      An Order allowing Allstate to withdraw its defense of Folsom, which is currently being provided under a reservation of rights;

D.      Costs of Court;

E.      Attorney's fees; and

F.      Such other and further relief to which Allstate may be justly entitled.

Respectfully submitted,

ADAMI, GOLDMAN & SHUFFIELD
The Nowlin Building
9311 San Pedro, Suite 900
San Antonio, Texas 78216
Telephone: (210) 344-0500
Facsimile: (210) 344-7228

By: _____
MARTIN J. PHIPPS
State Bar No. 00791444

ATTORNEYS FOR PLAINTIFF,
ALLSTATE INSURANCE COMPANY

# EXHIBIT "A"

CVisPDF – www.fastio.com

23100.578

# Allstate

ALLSTATE INSURANCE COMPANY
BLUE RIDGE SUPPORT CENTER
PO BOX 12055
ROANOKE VA  24022
540-989-2200

Claim#  _820 16 18553_

To Whom It May Concern:

I, Linda Sisson, employee of Allstate Insurance Company, Roanoke, Virginia, do certify

that the enclosed is a copy of _a declaration page from 10-21-99 to 10-21-20_

for policy number _036533431_ in the name of

_A Earline Folsom_, _no coverage_
_for loss of 8-1-90._

_Linda Sisson_
Claim Support

State of Virginia, County of Roanoke

On this _27th_ day of _July_, 2000, before me

personally appeared Linda Sisson to me known to be the person who executed the

foregoing instrument and acknowledged that she executed the same as a free act and

deed.

_Darlene_ _____
Notary Public

My Commission Expires:

_53/03_

*Heinze and Assoc*
*302 Queen Isabella*
*Pt Isabel TX 78578*

**Your Quick Insurance Check**

✓ Verify the information listed in the Policy Declarations.
✓ Please call if you have any questions.
✓ File this package safely away.
✓ Watch the mail for your bill; it will arrive soon.

A Earline Folsom No 413
2101 Treasure Hills
Harlingen TX 78550-8715

It's time to renew your Allstate Condominium Form B policy.

Thanks for choosing Allstate to help with your insurance needs. As you can see, we have changed our renewal materials to make them less bulky and easier to understand. This new package also allows us to communicate with you more directly about important policy information or issues of particular interest to you.

This policy renewal offer contains your renewal documents, including the Declarations Page, which lists your coverages, limits, premium, and any discounts you're receiving. We recommend that you keep all of these documents in a safe place.

Finally, please note that your bill will arrive soon in a separate mailing.

Thanks again—your business is truly appreciated. We hope you'll find that this new look makes understanding your insurance easier. However, please continue to call us any time you have a question or claim at (956) 943-6481.

Sincerely,

*Bill Heinze*

Heinze and Assoc

# Allstate Insurance Company

A Stock Company
Home Office  Northbrook, IL 60062-6127

## RENEWAL
# Texas Homeowners Condominium Policy - Form B
# Declarations Page

## *Summary*

| NAMED INSURED / MAILING ADDRESS | YOUR ALLSTATE AGENT IS: | CONTACT YOUR AGENT AT: |
|---|---|---|
| A Earline Folsom No 413 | Heinze and Assoc | (956) 943-6481 |
| 2101 Treasure Hills | 302 Queen Isabella | |
| Harlingen TX 78550-8715 | Pt Isabel TX 78578 | |

| POLICY NUMBER | POLICY PERIOD | PREMIUM PERIOD |
|---|---|---|
| 0 36 538431 10/21 | Effective date:  Oct. 21, 1999 | Oct. 21, 1999  to Oct. 21, 2000 |
| | Expiration date: Oct. 21, 2000 | at 12:01 A.M. standard time |
| | at 12:01 A.M. standard time | |
| | at the location of the Residence Premises/Dwelling | |

**Residence Premises / Dwelling**

**Addition**

**Lot Block**
2101 TREASURE HILLS BLVD NO. 413, HARLINGEN, TX  78550

| AGENCY AT  Pt Isabel,TX | AGENT Heinze and Assoc |
|---|---|

## *Total Premium for the Premium Period*   *(Your bill will be mailed separately)*

| | |
|---|---|
| Premium for Property Insured | $266.00 |
| **TOTAL POLICY PREMIUM** | **$266.00** |

# Allstate Insurance Company
A Stock Company

Policy Number: **0 36 538431 10/21**   Your Agent:  **Heinze and Assoc  (956) 943-6481**
For Premium Period Effective:  **Oct. 21, 1999**

| COVERAGES | LIMITS OF LIABILITY | PREMIUM |
|---|---|---|
| (Other Coverages, Limits and Exclusions apply - Refer to your Policy) | | |
| **SECTION I**      **PROPERTY** | | |
| Coverage B.      Personal Property | $48,500 | |
| Personal Property Off Premises | $4,850 | |
| **SECTION II**      **LIABILITY** | | |
| Coverage C.      Personal Liability (Each Occurrence) | $300,000 | |
| Coverage D.      Medical Payments to Others (Each Person) | $1,000 | |
| Loss of Use Coverage | $9,700 | |
| **BASIC PREMIUM** | | **$240.00** |
| Increased Liability Limits Premium | | $9.00 |

| OTHER COVERAGES AND ENDORSEMENTS | LIMITS OF LIABILITY | PREMIUM |
|---|---|---|
| HO-105 (7-8-92) Residence Glass Coverage | | $6.00 |
| HO-382 (7-8-92) Condomium Loss Assessment Coverage | $5,000 | $11.00 |

| DEDUCTIBLES (SECTION I ONLY) | AMOUNT OF DEDUCTIBLE | DEDUCTIBLE ADJUSTMENT PREMIUM |
|---|---|---|
| Deductible Clause 3 - All Peril | $485.00 | $0.00 |
| **TOTAL POLICY PREMIUM** | | **$266.00** |

## RATING INFORMATION
Inside City Limit            Construction: Brick Veneer
Hydrant- Under 500 feet      Key Rate: 08      PPC: 04

CutePDF - www.tonto.com

# Allstate Insurance Company

A Stock Company

Policy Number: **0 36 538431 10/21**      Your Agent:    **Heinze and Assoc  (956) 943-6481**
For Premium Period Effective: **Oct. 21, 1999**

## Subject to the following Forms and Endorsements

Your Homeowners policy consists of this Policy Declarations and the documents listed below. Please keep these together.
- Texas Homeowners Condominium Policy - Form B (1-1-96)
- HO-101 (10-2-93) Replacement of Personal Property
- HO-105 (7-8-92) Residence Glass Coverage
- HO-382 (7-8-92) Condominium Loss Assessment Coverage

## Important Payment and Coverage Information

Please note: This is not a request for payment.  Your bill will be mailed separately.

IN WITNESS WHEREOF, **Allstate** has caused this policy to be signed by two of its officers at Northbrook, Illinois, and if required by state law, this policy shall not be binding unless countersigned on the Policy Declarations by an authorized agent of **Allstate**.

Case 1:01-cv-00020   Document 1   Filed in TXSD on 01/30/2001   Page 15 of 101

# Allstate Insurance Company
A Stock Company

Policy Number: **0 36 538431 10/21**      Your Agent:      **Heinze and Assoc  (956) 943-6481**
For Premium Period Effective: **Oct. 21, 1999**

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|
| To obtain information or make a complaint: | Para obtener informacion o para someter una queja: |
| You may call Allstate's toll-free telephone number for information or to make a complaint at | Usted puede llamar al numero de telefono gratis de Allstate para informacion o para someter una queja al |
| **1-800-949-2287** | **1-800-949-2287** |
| You may also write to Allstate at | Usted tambien puede escribir a Allstate |
| 8701 N. Freeport Pkwy Irving, TX 75063-1908 | 8701 N. Freeport Pkwy Irving, TX 75063-1908 |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at | Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al |
| **1-800-252-3439** | **1-800-252-3439** |
| You may write the Texas Department of Insurance | Puede escribir al Departamento de Seguros de Texas |
| P.O. Box 149104 Austin, TX 78714-9104 FAX # (512) 475-1771 | P.O. Box 149104 Austin, TX 78714-9104 FAX # (512) 475-1771 |

## PREMIUM OR CLAIM DISPUTES:
Should you have a dispute concerning your premium or about a claim, you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

## ATTACH THIS NOTICE TO YOUR POLICY:
This notice is for information only and does not become a part or condition of the attached document.

## DISPUTAS SOBRE PRIMAS O RECLAMOS:
Si tiene una disputa concerniente a su prima o a un reclamo debe comunicarse con el agente o la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

## UNA ESTE AVISO A SU POLIZA:
Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

CutePDF - www.cutepdf.com

# Allstate Texas Homeowners Condominium Policy Form B

**Policy:** 0 36 538431 10/21

**Effective:** October 21, 1999

**Issued to:**
A Earline Folsom No 413
2101 Treasure Hills
Harlingen TX 78550-8715

**By your Allstate agent:**
Heinze and Assoc
302 Queen Isabella
Pt Isabel TX 78578



Prescribed by the Texas Department of Insurance
Homeowners Condominium Form B—Effective July 8, 1992
(Revised January 1, 1996)

# QUICK REFERENCE
# TEXAS HOMEOWNERS CONDOMINIUM POLICY — FORM B

Insuring Agreement...........................................2
Definitions .......................................................2

## SECTION I — PROPERTY COVERAGE

Coverage B
  Personal Property...........................................3
  Personal Property Off Premises....................3
Special Limits of Liability...................................4
Property Not Covered ......................................4
Extensions of Coverage
  Debris Removal ..............................................5
  Loss of Use ....................................................5
  Reasonable Repairs .......................................5
  Property Removed...........................................5
  Consequential Loss ........................................5
  Automatic Removal .........................................6
Perils Insured Against
  Coverage B (Personal Property) ..................6

Exclusions......................................................7

Deductible ......................................................8

Section I — Conditions
  Insurable Interest and Limit of Liability .......8
  Residential Community Property Clause .....9
  Duties After Loss
    **Your Duties After Loss .................... 9**
    Our Duties After Loss ..............................9
  Loss Settlement...........................................10
  Loss to a Pair or Set ...................................10
  Salvage Rights.............................................11
  Appraisal ......................................................11
  Loss Payment ...............................................11
  Catastrophe Claims......................................11
  Other Insurance ...........................................11
  Suit Against Us .............................................11
  Abandonment of Property.............................11
  No Benefit to Bailee......................................12

## SECTION II — LIABILITY COVERAGE

Coverage C (Personal Liability)......................12
Coverage D (Medical Payments to Others)....12

Exclusions
  Coverage C and D Exclusions ....................12
  Coverage C Exclusions ...............................15
  Coverage D Exclusions ...............................15

Additional Coverages
  Claim Expenses............................................15

Imperative Medical Expenses to Others .....16
Damage to Property of Others....................16

Section II — Conditions
  Limit of Liability..........................................16
  Severability of Insurance ...........................16
  **Duties after Loss ............................17**
  Duties of an Injured Person .......................17
  Payment of Claim under Coverage D ........17
  Suit Against Us...........................................17
  Bankruptcy of the Insured .........................17
  Other Insurance.........................................17
  Notice of Settlement of Liability Claim........18

## POLICY CONDITIONS
## APPLYING TO SECTIONS I AND II

Policy Period ...............................................18
Concealment or Fraud...................................18
Liberalization Clause.....................................18
Waiver or Change of Policy Provisions..........18
Cancellation..................................................18
Refusal to Renew .........................................19
Assignment ..................................................19
Subrogation..................................................19
Death............................................................20

---

### YOUR DUTIES AFTER A LOSS

Section I:

1. Protect the property from further damage.
2. Give prompt written notice to the company.
3. Call the police if a law has been broken.
4. Make a list of all damaged personal property, including costs.
5. If requested, obtain proof of loss form from your agent or the company and submit within 91 days of the request.

Section II:

1. Do not make any voluntary payments except for first aid to others at the time of the accident.
2. Give written notice to agent or company, including details about the accident and any witnesses.
3. Send copies of legal notices you receive to the company.
4. Help the company get the necessary information to make settlement.

FOR A COMPLETE LIST OF YOUR DUTIES SEE
    PAGES 9 AND 17 OF YOUR POLICY.

---

# HOMEOWNERS CONDOMINIUM FORM B

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown on the declarations page and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance. In addition certain words and phrases are defined as follows:

1. "**Bodily injury**" means bodily harm, sickness or disease. This includes required care, loss of services and death that results.

2. "**Business**" includes trade, profession or occupation.

3. "**Business day**" when used in this policy means a day other than a Saturday, Sunday or holiday recognized by the state of Texas.

4. "**Insured**" means you and residents of your household who are:

   a. your relatives; or

   b. other persons under the age of 21 and in the care of any person named above.

   Under Section II Liability, "**insured**" also means:

   c. any person or organization legally responsible for animals or watercraft to which this policy applies. You or a person included in 4.a. or 4.b. above must own the animal or watercraft. A person or organization using or having custody of these animals or watercraft without consent of the owner is not an **insured**.

d. With respect to any vehicle to which this policy applies:

   (1) any employee of an **insured** while engaged in the employment of the **insured**; or

   (2) any other person using the vehicle on an **insured location** with your consent.

5. "**Insured location**" means:

   a. the **residence premises**.

   b. the part of other premises, other structures and grounds you use as a residence and:

      (1) which is shown on the declarations page; or

      (2) which you acquire during the policy period for your use as a residence.

   c. any premises you use in connection with a premises in 5.a. or 5.b. above.

   d. any part of a premises:

      (1) not owned by an **insured**; and

      (2) where an **insured** is temporarily residing.

   e. vacant land, other than farm land, owned by or rented to an **insured**.

**HO-B-CON**                                              **Page 2**

f. land owned by or rented to an **insured** on which a one or two family dwelling is being built as a residence for an **insured**.

g. individual or family cemetery plots or burial vaults of an **insured**.

h. any part of a premises occasionally rented to an **insured** for other than **business** use.

6. "**Occurrence**" means an accident, including exposure to conditions, which results in **bodily injury** or **property damage** during the policy period.

7. "**Property damage**" means injury to, destruction of, or loss of use of property.

8. "**Residence employee**" means an employee of an **insured** who performs duties related to the ownership, maintenance or use of the **residence premises**, including maintenance or use of a motor vehicle. This includes employees who perform similar duties elsewhere for an **insured**. This does not include employees while performing duties related to the **business** of an **insured**.

9. "**Residence premises**" means the condominium unit shown on the declarations page as the **residence premises** where an **insured** resides or intends to reside within 60 days after the effective date of this policy.

# SECTION I PROPERTY COVERAGE

## COVERAGE B (PERSONAL PROPERTY)

We cover:

1. a. personal property owned, worn or used by an **insured** while on the **residence premises**. This includes window or wall air conditioning units.

   b. at your request, property of others while the property is on the part of the **residence premises** occupied by an **insured**.

2. a. personal property owned, worn or used by an **insured** anywhere in the world.

   b. at your request, personal property of a **residence employee** when:

(1) the property is away from the residence premises of the **residence employee** and in the control of the **residence employee**; and

(2) while the **residence employee** is performing work for you.

Our total limit of liability under 2.a. and 2.b. above is 10% of the Coverage B (Personal Property) limit of liability or $1,000, whichever is greater. This is additional insurance and does not reduce the Coverage B (Personal Property) limit of liability.

3. a. alterations, fixtures, installations and additions which are part of the building and contained within the

HO-B-CON                                                                     **Page 3**

unfinished interior surfaces of the perimeter walls, floors and ceilings of the **residence premises**.

b. the exterior surfaces of balconies and terraces of the **residence premises**.

We do not cover property in or on the residence premises which is defined in the condominium's declarations or bylaws as a common element.

**SPECIAL LIMITS OF LIABILITY**. These limits do not increase the Coverage B (Personal Property) limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. Money/Bank Cards. $100 on money or numismatic property or loss by theft or unauthorized use of bank fund transfer cards registered to an **insured**.

2. Bullion/Valuable Papers. $500 on gold or silver bullion, manuscripts, notes, securities, stamps, philatelic property, accounts, bills, deeds, evidences of debt, letters of credit, passports, documents, transportation or other tickets.

3. Jewelry/Watches/Furs. $500 for loss by theft of gems, watches, jewelry or furs.

4. **Business** Personal Property. $2,500 on **business** property.

   We do not cover any **business** property:

   a. that consists of samples or articles for sale or delivery; or

   b. if the property is away from the **residence premises**.

**PROPERTY NOT COVERED**. We do not cover:

1. articles separately described and specifically insured by this or other insurance.

2. animals or birds.

3. motor or engine propelled vehicles or machines designed for movement on land, including attached machinery or equipment.

   However, we do cover such vehicles which are not subject to motor vehicle registration and are:

   a. devices and equipment for assisting the handicapped.

   b. power mowers.

   c. golf carts.

   d. vehicles or machines used for recreational purposes while located on the **residence premises**.

   e. farm equipment not designed for use principally on public roads.

4. trailers, semi-trailers or mobile homes.

   However, we do cover:

   a. trailers and semi-trailers that are designed for use principally off public roads.

   b. boat trailers while on the **residence premises**.

5. aircraft, meaning any device used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

6. watercraft, including outboard motors and furnishings or equipment.

   We do cover watercraft, including outboard motors and furnishings or equipment, while located on land on the **residence premises**.

**HO-B-CON**

**Page 4**

7.  property of roomers or boarders not related to an **insured**.

8.  property usually rented to others off the **residence premises**.

9.  property regularly rented or held for rental to others by you.

We do cover:

a.  property contained in the part of the **residence premises** normally occupied solely by you and occasionally rented to others.

b.  property of an **insured** in the portion of the **residence premises** occupied by roomers or boarders.

## EXTENSIONS OF COVERAGE.

1.  **DEBRIS REMOVAL**. We will pay your expense for the removal from the **residence premises** of:

    a.  debris of covered property if a Peril Insured Against causes the loss.

    b.  a tree that has damaged covered property if a Peril Insured Against causes the tree to fall.

    This does not increase the limit of liability that applies to the damaged property.

2.  **LOSS OF USE**. If a loss caused by a Peril Insured Against under Section I makes the **residence premises** wholly or partially untenantable, we cover:

    a.  additional living expense, meaning any necessary and reasonable increase in living expense you incur so that your household can maintain its normal standard of living.

b.  fair rental value, meaning the fair rental value of that part of the **residence premises** usually rented to others by you, less any expenses that do not continue.

The total limit of liability for all loss of use is 20% of the Coverage B (Personal Property) limit of liability. This is additional insurance and does not reduce the Coverage B (Personal Property) limit of liability. The deductible clause does not apply to loss of use coverage.

Payment will be for the reasonable time required to repair or replace the damaged property. If you permanently relocate, payment will be for the reasonable time required for your household to become settled.

The periods of time for loss of use are not limited by expiration of this policy.

3.  **REASONABLE REPAIRS**. If a Peril Insured Against causes the loss, we will pay the reasonable cost you incur for necessary repairs made solely to protect covered property from further damage. This coverage does not increase the limit of liability that applies to the property being repaired.

4.  **PROPERTY REMOVED**. We pay for expense and damage incurred in the removal of covered property from an **insured location** endangered by a Peril Insured Against. This coverage exists on a pro rata basis for 30 days at each location to which such property is removed for preservation. This is not additional insurance and does not increase the Coverage B (Personal Property) limit of liability.

5.  **CONSEQUENTIAL LOSS**. We insure:

    a.  property contained in a building on the **residence premises** against loss due to

**HO-B-CON**                                                    **Page 5**

change in temperature as a direct result of physical damage to the dwelling, or any equipment contained in the dwelling, caused by a Peril Insured Against. The deductible clause does not apply to this coverage.

b.  property contained in a building on the **residence premises** against a loss due to change in temperature as a direct result of physical damage to any power, heating or cooling equipment (including connections and supply pipes) not contained in or on the dwelling, caused by a Peril Insured Against.

The total limit of liability for the coverage described in 5.b. above is $500. This is not additional insurance and does not increase the Coverage B (Personal Property) limit of liability.

7.  **AUTOMATIC REMOVAL.** If you move from the **residence premises** shown on the declarations page to another location within the United States, to be occupied as your principal residence, we cover:

a.  the personal property under Coverage B (Personal Property) at each location in the proportion that the value at each location bears to the total value of all the personal property covered under Coverage B (Personal Property).

b.  property in transit up to 10% of the Coverage B (Personal Property) limit of liability or $1,000, whichever is greater.

We provide coverage for only 30 days from the date the removal begins.

# SECTION I PERILS INSURED AGAINST

## COVERAGE B (PERSONAL PROPERTY)

We insure against physical loss to the property described in Section I Property Coverage, Coverage B (Personal Property) caused by a peril listed below, unless the loss is specifically excluded. The exclusions contained in this section do not apply to an ensuing loss caused by fire or explosion except as specifically provided.

1.  **Fire and Lightning.**

    We do not cover loss to electrical appliances devices, or wiring caused by electricity, other than lightning.

2.  **Sudden and Accidental Damage from Smoke.**

    We do not cover loss caused by smog or by smoke from industrial or agricultural operations.

3.  **Windstorm, Hurricane and Hail.**

Coverage under these perils does not include:

a.  loss to cloth awnings, greenhouses and their contents, buildings or structures located wholly or partially over water and their contents.

b.  loss to radio and television towers, outside satellite dishes, masts and antennas, including lead-in wiring, windchargers and windmills.

c.  loss to personal property contained in a building unless direct force of wind or hail makes an opening in a roof or wall and rain, snow, sand or dust enters through this opening and causes the damage.

4.  **Explosion.**

5.  **Aircraft and Vehicles.**

HO-B-CON

Page 6

CUtoPDF - www.fwsto.com

6. **Vandalism and Malicious Mischief.**

7. **Riot and Civil Commotion.**

8. **Collapse of Building** or any part of the building.

9. **Accidental Discharge, Leakage or Overflow of Water or Steam** from within a plumbing, heating or air conditioning system or household appliance.

10. **Falling Objects.**

This peril does not include loss to property contained in a building unless the roof or outside wall of the building is first damaged by the falling objects.

11. **Freezing** of plumbing, heating and air conditioning systems and household appliances.

We do not cover loss caused by or resulting from freezing while the building is unoccupied unless you have used reasonable care to:

a. maintain heat in the building; or

b. shut off the water supply and drain plumbing, heating and air conditioning systems of water.

12. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

a. We do not cover loss by theft:

(1) of personal property while away from the <u>**residence premises**</u> at any other residence owned by, rented to or occupied by an <u>**insured**</u>, except while an <u>**insured**</u> is temporarily living there.

(2) of building materials and supplies not on the <u>**residence premises**</u>.

b. While any portion of the residence premises normally occupied by you is rented to others, we do not cover loss by theft:

(1) of money, bullion, numismatic property or bank notes.

(2) of securities, accounts, bills, deeds, evidences of debt, letters of credit, notes other than bank notes, passports, railroad and other tickets, or stamps including philatelic property.

(3) of jewelry, watches, necklaces, bracelets, gems, precious and semi precious stones, articles of gold and platinum or fur or fur trimmed articles when the principal value is the fur.

(4) caused by a tenant, his employees or members of his household while renting the portion of the <u>**residence premises**</u> normally occupied by you.

## SECTION I EXCLUSIONS

1. **WATER DAMAGE.**

We do not cover loss caused by or resulting from flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water or spray from any of these whether or not driven by wind.

We do cover ensuing loss by fire or explosion.

HO-B-CON

**Page 7**

We do cover ensuing loss by theft or attempted theft or any act or attempted act of stealing.

2. **GOVERNMENTAL ACTION**.

We do not cover loss caused by the destruction of property by order of governmental authority.

But we do cover loss caused by the acts of destruction ordered by governmental authority taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

3. **BUILDING LAWS**.

We do not cover loss caused by or resulting from the enforcement of any ordinance or law regulating the construction, repair or demolition of a building or structure.

4. **WAR DAMAGE**.

We do not cover loss resulting directly or indirectly from war. This includes undeclared war, civil war, insurrection, rebellion, revolution, warlike act by military personnel, destruction or seizure or use for military purpose, and any consequence of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

5. **NUCLEAR DAMAGE**.

We do not cover loss resulting directly or indirectly from nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused. We do cover direct loss by fire resulting from nuclear reaction, radiation or radioactive contamination.

## SECTION I DEDUCTIBLE

**DEDUCTIBLE CLAUSE 3**. The amount shown on the declarations page for Deductible Clause 3 will be deducted from the total of each loss under Coverage B (Personal Property).

If a single event causes loss by windstorm, hurricane, hail or wind driven rain and loss by lightning, the deductible will apply only once.

## SECTION I CONDITIONS

1. **Insurable Interest and Limit of Liability**. Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. to the **insured** for more than the amount of the **insured's** interest at the time of loss; or

   b. for more than the applicable limit of liability.

   Each time there is a loss to any alterations, fixtures, installations and additions which are part of the building insured under Coverage B

(Personal Property), the amount of insurance applicable to alterations, fixtures, installations and additions which are part of the building for loss by fire will be reduced by the amount of loss. As repairs are made, the amount of insurance will be reinstated up to the limit of liability as shown on the declarations page.

Article 6.13. Policy A Liquidated Demand. A fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the company for the full amount of such policy. The provisions of this article shall not apply to personal property.

2. **Residential Community Property Clause.**
This policy, subject to all other terms and
conditions, when covering residential
community property, as defined by state law,
shall remain in full force and effect as to the
interest of each spouse covered, irrespective
of divorce or change of ownership between
the spouses unless excluded by
endorsement attached to this policy, until the
expiration of the policy or until cancelled in
accordance with the terms and conditions of
this policy.

3. **Duties After Loss.**

   a. **Your Duties After Loss.** In case of a loss
   to covered property caused by a peril
   insured against, you must:

      (1) give prompt written notice to us of
      the facts relating to the claim.

      (2) notify the police in case of loss by
      theft.

      (3) (a) protect the property from
      further damage.

         (b) make reasonable and
         necessary repairs to protect the
         property.

         (c) keep an accurate record of
         repair expenses.

      (4) furnish a complete inventory of
      damaged personal property
      showing the quantity, description
      and amount of loss. Attach all bills,
      receipts and related documents
      which you have that justify the
      figures in the inventory.

      (5) as often as we reasonably require:

         (a) provide us access to the
         damaged property.

         (b) provide us with pertinent
         records and documents we
         request and permit us to make
         copies.

         (c) submit to examination under
         oath and sign and swear to it.

      (6) send to us, if we request, your
      signed sworn proof of loss within
      91 days of our request on a
      standard form supplied by us. We
      must request a signed sworn proof
      of loss within 15 days after we
      receive your written notice, or we
      waive our right to require a proof of
      loss. Such waiver will not waive our
      other rights under this policy.

         (a) This proof of loss shall state, to
         the best of your knowledge and
         belief:

            (i) the time and cause of loss.

            (ii) the interest of the **insured**
            and all others in the
            property involved including
            all liens on the property.

            (iii) other insurance which may
            cover the loss.

            (iv) the actual cash value of
            each item of property and
            the amount of loss to each
            item.

   b. **Our Duties After Loss:**

      (1) Within 15 days after we receive your
      written notice of claim, we must:

         (a) acknowledge receipt of the
         claim.

**HO-B-CON**

**Page 9**

If our acknowledgement of the claim is not in writing, we will keep a record of the date, method and content of our acknowledgement.

(b) begin any investigation of the claim.

(c) specify the information you must provide in accordance with "Your Duties After Loss" (item 3.a. above).

We may request more information, if during the investigation of the claim such additional information is necessary.

(2) After we receive the information we request, we must notify you in writing whether the claim will be paid or has been denied or whether more information is needed:

(a) within 15 business days; or

(b) within 30 days if we have reason to believe the loss resulted from arson.

(3) If we do not approve payment of your claim or require more time for processing your claim, we must:

(a) give the reason for denying your claim, or

(b) give the reasons we require more time to process your claim. But, we must either approve or deny your claim within 45 days after request for more time.

4. **Loss Settlement**.

a. Personal Property (excluding alterations, fixtures, installations and additions which are part of the building).

Our limit of liability and payment for covered losses under Section I will not exceed the smallest of the following:

(1) the actual cash value at the time of the loss determined with proper deduction for depreciation;

(2) the cost to repair or replace the damaged property with material of like kind and quality, with proper deduction for depreciation; or

(3) the specified limit of liability of the policy.

b. Alterations, fixtures, installations and additions which are part of the building.

Our limit of liability and payment for covered losses under Section I will be:

(1) actual expenses incurred by you, if the damaged or destroyed property is repaired or replaced within a reasonable time after the loss.

(2) the actual cash value of the damaged or destroyed property, if the damaged or destroyed property is not repaired or replaced within a reasonable time after the loss.

Any amount you collect for the damaged or destroyed property, from other insurance covering the interest of the unit-owners of the condominium collectively, will be deducted from the amount of loss to be paid under this policy.

5. **Loss to a Pair or Set**. In case of loss to an item which is part of a pair or set, the

**HO-B-CON**

**Page 10**

measure of loss shall be a reasonable and fair proportion of the total value of the pair or set. The importance of the item will be considered in assessing the loss. Such loss will not be considered a total loss of the pair or set.

6. **Salvage Rights.** If we notify you that we will pay your claim or part of your claim, the notice must also state whether we will or will not take all or any part of the damaged property. We must bear the expense of our salvage rights.

7. **Appraisal.** If you and we fail to agree on the actual cash value, amount of loss, or cost of repair or replacement, either can make a written demand for appraisal. Each will then select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a district court of a judicial district where the loss occurred. The two appraisers will then set the amount of loss, stating separately the actual cash value and loss to each item.

If the appraisers fail to agree, they will submit their differences to the umpire. An itemized decision agreed to by any two of these three and filed with us will set the amount of the loss. Such award shall be binding on you and us.

Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally.

8. **Loss Payment.**

   a.   If we notify you that we will pay your claim, or part of your claim, we must pay within 5 business days after we notify you.

   b.   If payment of your claim or part of your claim requires the performance of an act by you, we must pay within 5 business days after the date you perform the act.

9. **Catastrophe Claims.**

   If a claim results from a weather related catastrophe or a major natural disaster, each claim handling deadline shown under the Duties After Loss and Loss Payment provisions is extended for an additional 15 days.

   Catastrophe or major natural disaster means a weather related event which;

   a.   is declared a disaster under the Texas Disaster Act of 1975; or

   b.   is determined to be a catastrophe by the State Board of Insurance.

10. **Other Insurance — Section I.** If a loss covered by this policy is also covered by:

   a.   other insurance in the name of the condominium association, the insurance provided in this policy will be excess over the amount collectible under the other insurance.

   b.   other insurance (not in the name of the condominium association), we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

11. **Suit Against Us.** No suit or action can be brought unless the policy provisions have been complied with. Action brought against us must be started within two years and one day after the cause of action accrues.

12. **Abandonment of Property.** There can be no abandonment of property to us.

**HO-B-CON**                                                        **Page 11**

13. **No Benefit to Bailee**. We will not recognize any assignment or grant any coverage for the benefit of a person or organization holding, storing or moving property for a fee.

## SECTION II LIABILITY COVERAGE

**COVERAGE C (Personal Liability)**

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable. Damages include pre-judgment interest awarded against the **insured**; and

2. provide a defense at our expense by counsel of our choice even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate.

**COVERAGE D (Medical Payments to Others)**

We will pay the necessary medical expenses incurred or medically determined within three years from the date of an accident causing **bodily injury**. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household. This coverage does apply to **residence employees**. As to others, this coverage applies only:

1. to a person on the **insured location** with the permission of an **insured**.

2. to a person off the **insured location**, if the **bodily injury**:

   a. arises out of a condition on the **insured location** or the ways immediately adjoining.

   b. is caused by the activities of an **insured**.

   c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**.

   d. is caused by an animal owned by or in the care of an **insured**.

## SECTION II EXCLUSIONS

1. **Coverage C (Personal Liability) and Coverage D (Medical Payments to Others)** do not apply to:

   a. **bodily injury** or **property damage** which is caused intentionally by or at the direction of the **insured**.

   b. **bodily injury** or **property damage** arising out of or in connection with a **business** engaged in by an **insured**. But this exclusion does not apply to activities which are ordinarily incidental to non-business pursuits.

   c. **bodily injury** or **property damage** arising out of the rental or holding for rental of any part of any premises by an **insured**. This exclusion does not apply to the rental or holding for rental of an **insured location**:

**HO-B-CON**                                                                 **Page 12**

(1) on an occasional basis if used only as a residence.

(2) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders.

(3) in part, as an office, school or studio.

(4) if the rental is for not more than three car spaces or stalls in garages or stables.

d. **bodily injury** or **property damage** arising out of the rendering of or failure to render professional services.

e. **bodily injury** or **property damage** arising out of a premises:

(1) owned by an **insured**;

(2) rented to an **insured**; or

(3) rented to others by an **insured**;

that is not an **insured location**.

This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**.

f. **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of:

(1) motor or engine propelled vehicles or machines designed for movement on land, including attached machinery or equipment:

(2) trailers, semi-trailers or mobile homes:

which are owned or operated by or rented or loaned to an **insured**.

However, this exclusion does not apply to:

(1) motor vehicles which are not subject to motor vehicle registration and are:

(a) used for assisting the handicapped.

(b) used to service an **insured location**.

(c) golf carts while on the **residence premises** or used for golfing purposes.

(d) designed and used for recreational purposes, and are:

(i) not owned by an **insured**; or

(ii) owned by an insured while on the **residence premises**.

(e) in dead storage on the **residence premises**.

(f) used exclusively on the **residence premises**.

(2) trailers or semi-trailers while not being towed by or carried on a motor vehicle.

This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**.

g.  **bodily injury** or **property damage**
    arising out of the ownership,
    maintenance, operation, use, loading or
    unloading of watercraft:

    (1) with inboard or inboard-outdrive
        motor power of more than 50
        horsepower owned by or rented to
        an **insured**.

    (2) powered by one or more outboard
        motors with more than 25 total
        horsepower if the outboard motor is
        owned by an **insured**. But, outboard
        motors of more than 25 total
        horsepower are covered for the
        policy period if:

        (a) you acquire them prior to the
            policy period and:

            (i)  you declare them at policy
                 inception; or

            (ii) your intention to insure is
                 reported to us in writing
                 within 45 days after you
                 acquire the outboard
                 motors.

        (b) you acquire them during the
            policy period.

    (3) that is a sailing vessel, with or
        without auxiliary power, which is 26
        feet or more in length owned by or
        rented to an **insured**.

This exclusion does not apply while the
watercraft is on the **residence premises**.

This exclusion does not apply to **bodily
injury** to a **residence employee** arising out
of and in the course of the **residence
employee's** employment by an **insured**.

h.  **bodily injury** or **property damage**
    arising out of the ownership,
    maintenance, operation, use, loading or
    unloading of aircraft.

    Aircraft means any device used or
    designed for flight, except model or
    hobby aircraft not used or designed to
    carry people or cargo.

This exclusion does not apply to **bodily
injury** to a **residence employee** arising out
of and in the course of the **residence
employee's** employment by an **insured**.

i.  **bodily injury** or **property damage**
    arising out of:

    (1) The entrustment by an **insured** to
        any person; or

    (2) the negligent supervision by an
        **insured** of any person;

    with regard to the ownership,
    maintenance or use of any motor
    vehicle, watercraft or aircraft which is
    excluded in paragraph f., g. or h. above.

This exclusion does not apply to **bodily
injury** to a **residence employee** arising out
of and in the course of the **residence
employee's** employment by an **insured**.

j.  **bodily injury** or **property damage**
    caused directly or indirectly by war. This
    includes undeclared war, civil war,
    insurrection, rebellion, revolution,
    warlike act by a military force or military
    personnel, destruction or seizure or use
    for a military purpose, and any
    consequence of these. Discharge of a
    nuclear weapon will be deemed a warlike
    act even if accidental.

k.  **bodily injury** or **property damage**
    arising out of the transmission of

**HO-B-CON**                                    **Page 14**

sickness or disease by an **insured** through sexual contact.

l.  **bodily injury** to any person eligible to receive any benefits voluntarily provided or required to be provided by an **insured** under any workers' compensation law or occupational disease law.

2.  **Coverage C (Personal Liability)** does not apply to:

a.  liability under any contract or agreement.

However, this exclusion does not apply to written contracts:

(1)  that directly relate to the ownership, maintenance or use of an **insured location**; or

(2)  where the liability of others is assumed by an **insured**;

unless excluded elsewhere in this policy.

b.  **property damage** to property owned by an **insured**.

c.  **property damage** to property rented to, occupied or used by or in the care of an **insured**.

This exclusion does not apply to **property damage** caused by fire, smoke or explosion.

d.  **bodily injury** or **property damage** for which an **insured** under this policy is also an insured under a nuclear energy liability policy or would be an insured under that policy but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by American Nuclear Insurers, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada.

e.  **bodily injury** to you or an **insured** within the meaning of part a. or part b. of **insured** as defined.

3.  **Coverage D (Medical Payments to Others)** does not apply to:

a.  **bodily injury** to a **residence employee** if the **bodily injury**:

(1)  occurs off the **insured location**; and

(2)  does not arise out of or in the course of the **residence employee's** employment by an **insured**.

b.  **bodily injury** to any person, other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

## SECTION II ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1.  **Claim Expenses**. We pay:

a.  expenses we incur and costs taxed against an **insured** in any suit we defend.

b.  premiums on bonds required in a suit we defend but not for bond amounts more than the limit of liability for Coverage C (Personal Liability). We need not apply for or furnish any bond.

**HO-B-CON**                                                        **Page 15**

c. reasonable expense incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit.

d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **Imperative Medical Expenses to Others.** We pay expenses incurred by an **insured** for immediate medical and surgical relief to others if imperative at the time of the accident.

3. **Damage to Property of Others**. We pay replacement cost up to $500 per **occurrence** for **property damage** to property of others caused by an **insured**.

We do not pay for **property damage**:

a. caused intentionally by an **insured** who is 13 years of age or older.

b. to property owned by an **insured**.

c. to property owned by or rented to a tenant of an **insured** or a resident in your household.

d. arising out of:

(1) a **business** engaged in by an **insured**.

(2) any act or omission in connection with a premises owned, rented or controlled by an insured, other than the **insured location**.

(3) the ownership, maintenance, use, loading or unloading of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

This exclusion does not apply to any motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an **insured**.

## SECTION II CONDITIONS

1. **Limit of Liability**. The limit of liability for Coverage C (Personal Liability) shown on the declarations page is our total liability under Coverage C (Personal Liability) for all damages resulting from any one **occurrence**. This limit is the same regardless of the number of **insureds**, claims made or persons injured.

The limit of liability for Coverage D (Medical Payments to Others) shown on the declarations page is our total liability under Coverage D (Medical Payments to Others) for all medical expense payable for **bodily injury** to one person as the result of one accident. The total limit of our liability for all expenses payable to two or more persons injured in one accident is $25,000.

2. **Severability of Insurance**. This insurance applies separately to each **insured**. This condition will not increase our limit of liability for any one **occurrence**.

HO-B-CON                                          Page 16

3. **Duties After Loss.** In case of an accident or **occurrence**, the **insured** will perform the following duties that apply or will help us by seeing that these duties are performed:

   a. Give written notice to us or our agent as soon as is practical, which sets forth:

      (1) the identity of the policy and **insured**.

      (2) reasonably available information on the time, place and circumstances of the accident or **occurrence**.

      (3) names and addresses of any claimants and witnesses.

   b. Promptly forward to us every notice, demand, summons or other process relating to the accident or occurrence.

   c. At our request, help us:

      (1) to make settlement.

      (2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured**.

      (3) with the conduct of suits, including attending hearings and trials.

      (4) to secure evidence and obtain the attendance of witnesses.

   d. The **insured** will not, except at the **insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for immediate medical and surgical relief to others at the time of the **bodily injury**.

4. **Duties of an Injured Person ⎯ Coverage D (Medical Payments to Others).**

The injured person or someone acting for the injured person will:

   a. give us written proof of claim, under oath if required, as soon as is practical.

   b. authorize us to obtain copies of medical reports and records.

The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim ⎯ Coverage D (Medical Payments to Others).** Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

No one will have the right to join us as a party to any action against an **insured**. Also, no action with respect to Coverage C (Personal Liability) can be brought against us until the obligation of the **insured** has been determined by final judgment or agreement.

Under Coverage D (Medical Payments to Others), no action can be brought until 30 days after the required proofs of claim have been filed with us.

7. **Bankruptcy of the Insured.** Bankruptcy or insolvency of the **insured** or of the **insured's** estate will not relieve us of our obligations under this policy.

8. **Other Insurance ⎯ Section II.** If the **insured** has other insurance under Coverage C (Personal Liability), we will not be liable for a greater proportion of a loss than the limit of liability shown on the declarations page bears to the total limit of all valid and collectible insurance against such loss.

**HO-B-CON**

**Page 17**

However, with respect to loss arising out of the ownership, maintenance, operation, use, loading or unloading of:

a.  any motor vehicle or recreational motor vehicle at the **residence premises**: or

b.  watercraft.

this policy will not apply to the extent that any valid and collectible insurance is available to the **insured**.

9.  **Notice of Settlement of Liability Claim**.

a.  We will notify the **insured** in writing of any initial offer to compromise or settle a claim against the **insured** under the liability section of this policy. We will give the **insured** notice within 10 days after the date the offer is made.

b.  We will notify the **insured** in writing of any settlement of a claim against the **insured** under the liability section of this policy. We will give the insured notice within 30 days after the date of the settlement.

# SECTION I AND II CONDITIONS

1.  **Policy Period**. This policy applies only to loss in Section I or **bodily injury** or **property damage** in Section II which occurs during the policy period stated on the declarations page.

2.  **Concealment or Fraud**. This policy is void as to you and any other **insured**, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance, made false statements or committed fraud relating to this insurance, whether before or after a loss.

3.  **Liberalization Clause**. If the State Board of Insurance adopts a revision which would broaden or extend the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened or extended coverage will immediately apply to this policy.

4.  **Waiver or Change of Policy Provisions**. Changes in this policy may be made and perils added only by attaching a written endorsement properly executed by our authorized agent. No provision of this policy

may be waived unless the terms of this policy allow the provision to be waived. Or request for an appraisal or examination will not waive any of our rights.

5.  **Cancellation**:

a.  You may cancel this policy at any time by notifying us of the date cancellation is to take effect. We will send you any refund due when the policy is returned to us.

b.  We may cancel this policy for the reasons stated in this condition by mailing you notice in writing of the date cancellation takes effect.

(1)  If this policy has been in effect for less than 90 days and is not a renewal policy, we may cancel this policy for any reason.

The effective date of cancellation cannot be before:

(a)  the 10th day after we mail notice if we cancel for non-payment of premium.

HO-P

Page 18

CItyPDF - www.texto.com

(b) the 30th day after we mail notice if we cancel for any other reason.

(2) If this policy has been in effect 90 days or more, we may not cancel this policy unless:

(a) you do not pay the premium or any portion of the premium when due.

(b) the State Board of Insurance determines that continuation of the policy would violate the Texas Insurance Code or any other laws governing the business of insurance in this state.

(c) you submit a fraudulent claim.

(d) there is an increase in the hazard covered by this policy that is within your control and that would produce an increase in the premium/rate of this policy.

The effective date of cancellation cannot be before the 10th day after we mail the notice. Our notice of cancellation must state the reason for cancellation.

c. If we cancel, our notice to you will state that if this refund is not included with the notice, it will be returned on demand.

d. We may not cancel this policy solely because you are an elected official.

6. **Refusal to Renew.**

a. We may not refuse to renew this policy because of claims for losses resulting from natural causes.

b. We may not refuse to renew this policy solely because you are an elected official.

c. We may refuse to renew this policy if you have filed three or more claims under the policy in any three year period that do not result from natural causes.

If you have filed two claims in a period of less than three years, we may notify you in writing, that if you file a third claim during the three year period, we may refuse to renew this policy by providing you proper notice of our refusal to renew as provided in d. below. If we do not notify you after the second claim, we may not refuse to renew this policy because of losses.

A claim does not include a claim that is filed but is not paid or payable under the policy.

d. If we refuse to renew this policy, we must deliver to you, or mail to you at your mailing address shown on the declarations page and any mortgagee named on the declarations page, written notice of our refusal to renew not later than the 30th day before the date on which this policy expires. Proof of mailing will be sufficient proof of notice. If we fail to give you proper notice of our decision not to renew, you may require us to renew the policy.

7. **Assignment.** Assignment to this policy will not be valid unless we give our written consent.

8. **Subrogation.** An **insured** may waive in writing before a loss, all rights of recovery

against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death**. If the named insured dies, we insure:

   a.   the named insured's spouse, if a

resident of the same household at the time of death.

b.   the legal representative of the deceased. However, if this legal representative was not an **insured** at the time of death of the named insured, this policy will apply to such legal representative only with respect to the premises of the original named insured.

c.   any person who is an **insured** at the time of such death, while a resident of said premise.

**HO-B-CON**

**Page 20**

# Allstate Insurance Company
A Stock Company

---

Policy Number: **0 36 538431 10/21**      Your Agent:      **Heinze and Assoc  (956) 943-6481**
For Premium Period Effective:  **Oct. 21, 1999**

# REPLACEMENT OF
# PERSONAL PROPERTY

## ENDORSEMENT NO. HO-101
### Effective October 2, 1993

SECTION I PROPERTY COVERAGE

For an included additional premium, our limit of liability and payment for covered loss to:

1.  personal property; and

2.  wall-to-wall carpeting and cloth awning (Forms HO-B & HO-C only);

is extended to include Replacement Cost. Replacement Cost means there will not be a deduction for depreciation. Payment will not exceed the smallest of the following:

   a.  the Coverage B (Personal Property) limit of liability;

   b.  the replacement cost at the time of loss;

   c.  for property that is repairable, the cost of repair with material of like kind and quality with no deduction for depreciation; or,

   d.  the interest of the **insured**.

**We do not pay replacement cost for:**

   a.  property which cannot be replaced.

   b.  property not maintained in good or workable condition.

   c.  property that is either obsolete or useless to the **insured** at the time of loss.

   d.  watercraft including outboard motors for any replacement cost in excess of $2,500.

   We will pay replacement cost of watercraft including outboard motors up to a limit of $2,500.

**Prescribed by the State Board of Insurance**                                          **Page 1**
**Endorsement No. HO-101 — Replacement of Personal Property — Effective October 2, 1993**

# Allstate Insurance Company
A Stock Company

---

Policy Number: 0 36 538431 10/21     Your Agent:    **Heinze and Assoc  (956) 943-6481**
For Premium Period Effective: **Oct. 21, 1999**

    e.    **Property that is not repaired or replaced.**

**Loss Settlement:**

    a.    We will pay you:

       1.    the replacement cost of your damaged property up to $1,500; and

       2.    the actual cash value of your remaining damaged property within 5 business days after we notify you that we will pay the claim.

       If you repair or replace the damaged property, you may make claim for reimbursement on a replacement cost basis for the replacement cost of your property exceeding $1,500. You must repair, restore or replace the property within 365 days after the loss. Reimbursement will be made within 5 business days after we receive proof that the property has been repaired, restored or replaced.

    b.    In lieu of (a.) above, we may offer and you may accept or reject our offer to provide a replacement item of like kind and quality for your damaged property.

# Allstate Insurance Company

A Stock Company

---

Policy Number: **0 36 538431 10/21**      Your Agent:      **Heinze and Assoc  (956) 943-6481**
For Premium Period Effective: **Oct. 21, 1999**

## RESIDENCE GLASS COVERAGE

## ENDORSEMENT NO. HO-105
### Effective July 8, 1992

The terms and conditions of this endorsement apply only to the property described in this endorsement. None of the terms, conditions and limits of liability stated in the policy apply to this endorsement except the Waiver or Change of Policy Provisions, Cancellation, Assignment, Subrogation and Definitions.

This insurance applies to: (check the box(es) that applies)

[x]   Unscheduled Glass;

[ ]   Scheduled Glass described in the schedule below;

     while in or on the dwelling or other structures on the **residence premises**.

1.   **Residence Glass Coverage**. We will pay for damages to residence glass caused by breakage of or by chemicals applied to such glass if:

     a.   described in the schedule below.

     b.   permanently attached to the dwelling or other structures on the **residence premises**, including storm windows and doors not permanently attached.

     We will also pay for making temporary repairs, resulting damage to encasing frames, and removing or replacing obstructions because of a covered loss to glass.

2.   **Exclusions**. We will not pay for loss or damage caused by:

     a.   fire.

     b.   war. This includes undeclared war, civil war, insurrection, rebellion or revolution or any consequence of these.

     c.   nuclear reaction, nuclear radiation or radioactive contamination or any consequence of these.

---

**Prescribed by the State Board of Insurance**                                                **Page 1**
**Endorsement No. HO-105 — Residence Glass Coverage**        ˜˜˜ ˜˜ ˙ 'y 8, 1992

# Allstate Insurance Company
A Stock Company

Policy Number: **0 36 538431 10/21**     Your Agent:     **Heinze and Assoc  (956) 943-6481**
For Premium Period Effective: **Oct. 21, 1999**

3.  **Loss Settlement.**

   a.  Unscheduled Residence Glass. We will not pay more than:

   (1)  $100 for all damage in any one occurrence for each of the following objects:

   (a)  multiple plate insulating unit;
   (b)  radiant heating panels;
   (c)  conservatory or greenhouse glass;
   (d)  chandeliers or light fixtures;
   (e)  jalousies, louvers or shutters;
   (f)  venetian type doors or windows;
   (g)  stained or leaded glass; or
   (h)  glass bricks, shingles or other structural glass.

   (2)  $100 for any one pane or plate of glass comprising any other object not listed in 3.a.(1) above.

   b.  Scheduled Residence Glass. We will not pay more than the smallest of the following:

   (1)  actual cash value of the property at the time of the loss;

   (2)  the cost to repair the damaged property with like kind and quality or replace the glass with safety glazing material when required by ordinance or law; or

   (3)  the limit of liability stated in the schedule below.

   c.  Pair or Set. If loss to an article which is part of a pair or set occurs, we will measure that loss at a reasonable and fair proportion of the total value of the pair or set giving consideration to the importance of the article.

   We will not pay a total loss to the pair or set when the loss is to an article that is part of a pair or set.

   d.  We may pay for the loss in money or may repair or replace the property. Any property we pay for or replace will become our property.

**Prescribed by the State Board of Insurance**                                      **Page 2**
**Endorsement No. HO-105 — Residence Glass Coverage — Effective July 8, 1992**

# Allstate Insurance Company
A Stock Company

Policy Number: **0 36 538431 10/21**     Your Agent:     **Heinze and Assoc (956) 943-6481**
For Premium Period Effective: **Oct. 21, 1999**

### SCHEDULED RESIDENCE GLASS

| Number in Plates | Length in Inches | Width in Inches | Description of Glass, Lettering and Ornamentation; Position in Building. The glass in plain flat glass with all edges set in frames, unless otherwise stated herein. | Specific Limit (if any) | Premium |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Total Scheduled Glass Premium $

4. **Your Duties After Loss**. In case of loss to covered property, you must:

   a.   give prompt written notice to us.

   b.   file a proof of loss at our request, on forms that we provide. If we request a proof of loss, we must request it not later than the 15th day after we receive your written notice. We may require this filing of proof of loss to be under oath.

5. **Action Against Us**. There can be no action against us unless you have complied with all the terms of this policy.

6. **Other Insurance**. If a loss covered under this endorsement is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this endorsement bears to the total amount of valid and collectible insurance covering the loss.

**Prescribed by the State Board of Insurance**                                             **Page 3**
**Endorsement No. HO-105 — Residence Glass Coverage — Effective July 8, 1992**

# Allstate Insurance Company
A Stock Company

Policy Number: **0 36 538431 10/21**      Your Agent:      **Heinze and Assoc  (956) 943-6481**
For Premium Period Effective:  **Oct. 21, 1999**

## CONDOMINIUM
## LOSS ASSESSMENT COVERAGE

## ENDORSEMENT NO. HO-382
### Effective July 8, 1992

For an included additional premium, we will pay your share of special assessment charged by the condominium association. The assessment must be made as result of:

1. a direct loss to the collectively owned condominium property and caused by a covered peril under this policy.

2. an **occurrence** to which SECTION II LIABILITY COVERAGE in this policy applies.

Our limit of liability is shown on the declarations page for this endorsement. But we will not pay more than $1,000 for your part of a special assessment resulting from a deductible in the insurance of the condominium association.

**DEDUCTIBLE:**  A $250 deductible applies to each loss under this coverage. No other policy deductible applies to this coverage.

Prescribed by the State Board of Insurance
Endorsement No. HO-382— Condominium Loss Assessment Coverage
Effective July 8, 1992

# EXHIBIT "B"

CVISPDF – www.faxiio.com

## CAUSE NO. 97-11-7227-E

THE PARENTS OR PARENT, INDIVIDUALLY AND AS NEXT FRIEND OF JOHN DOE 15 (GARY PALMER), JOHN DOE 16 (RAMONA BASEN), JOHN DOE 18 ( DEBORAH VIGLIANO), JOHN DOE 19 (JANICE STROUD), JOHN DOE 21 (GAIL NELL), JOHN DOE 23 (BONNIE THIER), JOHN DOE 27 (SUSAN YARBROUGH), JOHN DOE 29-A & B (ARLENE WHITE), JOHN DOE 33 (CANDY MARIN), JOHN DOE 34 (RHONDA BROWN), JOHN DOE 36 (PAULETTE HAWKINS), JOHN DOE 38 (R. E. DAVIS, JR.), JOHN DOE 42 (MARK SNIDER), JOHN DOE 47 (LAURIE ABALIAN), JOHN DOE 48 (SANDRA KUOEL) and JOHN DOE 50 (JOHN NAVARRE), JOHN DOE 51 (PETER JFAGAN) and each of the following individually: Parent of JOHN DOE 32 (MARIAN DOWELL), and Parent of JOHN DOE 49 (FLORIDA ROSE WRIDER), JEANNETTE BLANTON, CAROL EHM, JAMES P. FOLEY, TED REKERDRES, VON MICHAEL RISHER, CANDACE WYATT, ANNA OWENS, ELZIE WESTBROOK, CARRIE WOODS, LINDA CHAMPION, JAN BAKER, PAT GRAY, ELIZABETH BLUM, BECKY CAMPBELL, ENRIQUE MOLINA, SR, TOM MCINTYRE, ELIZABETH ALCORN, JOHN TRICE, SR., GAIL MADDEN, SUSANA AGUILAR, DEBRA MORRIS, TOMMYE LANHAM, JULES GASNER, JOE A HUNTER, TERRI CAMPBELL, EARL STOUT, THOMAS MASON, SHERWOOD FLORIA, JERROLD ARBINI, TROY LAMBERT, JUSTIN BLANTON, CHARLES EHM, RYAN FOLEY; ADAM REKERDRES, MICHAEL RISHER, WYATT TURNER, JAMES VARAS, ERIC WESTBROOK, MARK WOODS, JASON NULL, KRISTOPHER JOHNSON, ALAN EVERETT GRAY; JOHN CRUMBY, ENRIQUE MOLINA, JR., KEVIN MCINTYRE, RYAN ALCORN, JOHN TRICE, JR., STACE MCINTYRE, DAVID AGUILAR, SAMUEL CAMPBELL, SPENCER LANHAM, JOSEPH GASSNER, DAN CAMPBELL, ROBERT HUNTER, JOSHUA CAMPBELL, THOMAS MASON, DANIEL WRIDER, JOSEPH ARBINI, and SHANNON LAMBERT, Plaintiffs

v.

THE MARINE MILITARY ACADEMY, INC., d/b/a THE MARINE MILITARY ACADEMY, and, MAJ. GENERAL HAROLD G. GLASGOW, Lt. Col. G. D. ANDRESEN and Col. T.A.HOBBS, Individually and as Officers of MARINE MILITARY ACADEMY, and the BOARD OF TRUSTEES, Defendants

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

IN THE DISTRICT COURT OF

357TH JUDICIAL DISTRICT

OF

CAMERON COUNTY, TEXAS

MAR 1 0 2000

TO THE HONORABLE JUDGE VALDEZ:

Plaintiffs in the above entitled cause file their Thirteenth Amended Petition and request for Jury Trial and respectfully state as follows:

## I.

## JURISDICTION AND INTRODUCTION

1.     The Marine Military Academy ("MMA") in Harlingen, Cameron County, Texas, is a private, legally unregulated boarding school which, for approximately $16,500 per year per cadet, undertakes the care and custody of boys ages 12 through 22. All pertinent allegations contained in this petition occurred in Cameron County, Texas. Jurisdiction is proper in Cameron County pursuant to §15.002(1) of the Texas Civil Practice & Remedies Code. MMA has ignored and concealed the physical, sexual and emotional abuse that has plagued the school. MMA fraudulently induced the Plaintiff-Parents to trust them, through false advertising and representations designed to make parents think that MMA is a top-notch school and that it is part of the United States Marine Corps. Based on these material misrepresentations, MMA persuaded Plaintiff-Parents to pay a total of approximately $20,000 per year, including travel, etc. for the privilege of sending their Plaintiff-Sons to an inadequately supervised and unregulated school.

2.     It appears that the only thing regulated by law at the school is the food under the authority of the local health department. The teachers are not certified by the Texas Education Association (TEA), or any other governmental body. There appears to be no background checks, training requirements, or proficiency standards for the teachers and other staff members.

3.     To save money, the school placed older boys, some with known behavior problems, in charge of younger adolescent boys, in dormitories poorly supervised by adults. When the lights were turned off, serious foreseeable harm resulted. That harm included the traditional MMA "blanket parties" where older and stronger boys came into a young cadet's room, forcibly held him down under his blanket and proceeded to pummel him with socks or pillowcases containing

padlocks and bars of soap.

4.     Although Defendants, MMA, Lt. Col. G. D. Andresen and Maj. General Harold G. Glasgow specifically had numerous warnings and knowledge of security problems, night time dangers to cadets, and other forms of liability from parents and professionals, the brutality and hazing continued.  The daily emotional and physical pain suffered by the Plaintiff-Sons, to say nothing of the sexual occurrences, created such a pervasive fear that boys slept with makeshift weapons and clubs in their bunks to try to protect themselves through the night.  This hellish existence has been described in various forms by former cadets, Plaintiffs among others, as a "prison without guards" and a place like the movie, "Lord of the Flies."

5.     This was all done in the name of "discipline" and often at the implied or specific direction from drill instructors, coaches, or other MMA personnel, to young and impressionable boys, ages 12, 13, 14, etc. The Plaintiffs and their families have brought this action to warn other parents about MMA, to protect boys who might attend the school in the future, to stop the false and deceptive advertising, to obtain refunds of their tuition, and to obtain restitution for damages, both past and future, for themselves and their sons.

6.     The school "over-booked" enrollment knowing that there would be an attrition rate of a certain percentage, and despite this knowledge the Defendant school strongly encouraged full, up-front payment of tuition.  When Plaintiff-Parents pulled their boys out of MMA, the school engaged in the practice of refunding only a small portion of the $16,500 tuition only after a parent discovered the breach of the contract.  If they secured a small refund, e.g., $2,000, the Plaintiff-Parents were asked to sign a release of claims against the school, at which point they were generally unaware of the fraud perpetrated by the school with regard to the above-stated misrepresentations and the more serious harms, including sexual and physical abuse, which were often perpetrated against their Plaintiff-Sons.  The reason for the parents' continued ignorance has been that the Plaintiffs' sons had not immediately informed their parents, of the above-described conditions until

after leaving the school. The parents signed a release of claims, but were not fully informed as to the full extent of the child's abusive experiences, until a year or more had passed. This pattern has been consistently carried out by the school on a repetitive basis against individuals who have claimed a refund of tuition is due.

7.     Despite the knowledge of prior harm, and despite repeated requests by employees of the Defendant school to augment and increase the number of paid adult supervisors necessary to adequately supervise the boys, the Defendant school continued to refuse to provide additional adult supervision of the cadets. The Defendant school also participated in a "cover-up" to hide the fraud and damage perpetrated by the school and its agents.

## II.
## PARTIES

### DEFENDANTS:

8.     Defendant, Marine Military Academy (*MMA*) is a private school in Harlingen, Texas and is an Arizona non-profit corporation, Charter No. 00023804-07. This Defendant has been served with citation and has filed an answer.

9.     Defendant Maj. Gen. Harold G. Glasgow is an individual and was President of MMA for several years. He formerly resided in Cameron County and is now believed to be in Tennessee. He has been served with process, and has filed an answer.

10.     Defendant Lt. Col. G. D. Andresen is an individual and is still an employee of MMA. This Defendant has been served with citation and has filed an answer.

11.     Defendant Col. T. A. Hobbs is an individual and was an employee of MMA. He has been served with process and has filed an answer.

12.     The Board of the Marine Military Academy from 1994-1998 are being sued individually and in their capacity as directors and which include but are not limited to:

    A.     General Alfred M. Gray, Jr. USMC (Ret) Chairman of the Board 1994
    B.     Dr. E. Bruce Heilman, President 1994
    C.     Capt. William A. Gary, Executive Vice President 1994

| D. | Robert G. Farris, Sr., Treasurer/Assistant Secretary |
|----|----|
| E. | Brig. Gen. George L. Bartlett, USMC (Ret) |
| F. | Harold G. Blaschke |
| G. | Col. H. William Card, Jr. USMC (Ret), now mayor of Harlingen, Texas in Cameron Co. |
| H. | Col. George W. Carrington, USMC (Ret) |
| I. | Maj. Gen. Walter A. Churchill, USMC (Ret) |
| J. | Barry A. Zale of Dallas, Texas |
| K. | Evelyn East |
| L. | Col. James A. Embry USMC (Ret) |
| M. | A. Earline Folsom |
| N. | Col. Russell M. Harwood, USMC (Ret) |
| O. | Robert S. Jepson, Jr. |
| P. | Lt. Gen. William M. Keys, USMC (Ret) |
| Q. | Hugh L. McColl, Jr. |
| R. | Alvin G. Padilla, Jr. |
| S. | Brig. Gen. O.L.Peacock, Jr. |
| T. | Henry C.Schulte |
| U. | William M. Simmons |

Plaintiffs are in the process of locating these individuals and will be serving those defendants process as soon as they are located.

## PLAINTIFFS:

(Some of the names of the following Plaintiffs are redacted by order of the Court to protect the privacy interest of the juveniles.)

15.     John Doe 1 is Justin Blanton and the mother of John Doe 1 is Jeannette Blanton, who resides at 2705 Foxboro, Garland, Texas  75044.

16.     John Doe 2 is Charles Ehm, Jr. and the mother of John Doe 2 is Carol Ehm, who resides at 24 Pleasant Avenue, Lincoln Park, New Jersey  07035.

17.     John Doe 3 is Ryan Foley and the father of John Doe 3 is James P. Foley, who resides at 3407 Racquet Street, Nacogdoches, Texas  75961.

18.     John Doe 4 is Adam Rekerdres and the father and mother of John Doe 4 are Ted and Carolyn Rekerdres, who reside at 6432 Northport, Dallas, Texas  75230.

19.     John Doe 5 is Michael Risher and the father of John Doe 5 is Von Michael Risher, who resides at 2183 Buckingham Road, #181, Richardson, Texas  75081.

20.     John Doe 6 is Wyatt Turner and the mother of John Doe 6 is Candace Wyatt, who resides at 1400 Oaklawn, Corsicana, Texas  75110.

21.     John Doe 7 is James Varas and the mother of John Doe 7 is Anna Owens, who resides

at 12018 S. Blackjack Oak Circle, The Woodlands, Texas 77380.

22.    John Doe 8 is Eric Westbrook and the father of John Doe 8 is Elzie Westbrook, who resides at 5820 Foxhill Lane, Dallas, Texas 75232.

23.    John Doe 9 is Mark Woods and the father and mother of John Doe 9 are Dr. Mark and Carrie Woods, who reside at 10443 Rocky Hollow, La Porte, Texas 77571.

24.    John Doe 10 is Jason Null and the mother of John Doe 10 is Linda Champion, who resides at 2726 Brook Meadow, O'Fallon, Missouri 63366.

25.    John Doe 11 is Kristopher Johnson and the mother of John Doe 11 is Jan Baker, who resides at 3709 Maywood Court, Carrollton, Texas 75007.

26..   John Doe 12 is Alan Everett (Rett) Gray and the mother of John Doe 12 is Pat Gray, who resides at 606 Lee Shore Lane, Houston, Texas 77079.

27.    John Doe 13 is John Crumby and the mother of John Doe 13 is Elizabeth Blum, who resides at 10100 Frio Cove, Austin, Texas 78733.

28.    John Doe 14 is Enrique Molina, Jr. and the father John Doe 14 is Enrique Molina, Sr., who resides at 6105 N. 26th, McAllen, Texas 78504.

29.    John Doe 15 is Gary Palmer, Jr. and the father of John Doe 15 is Gary Palmer, who reside at 12411 Ravensmate Drive, Cypress, Texas 77429.

30.    John Doe 16 is Ronnie Lasly and the mother of John Doe 16 is Ramona G. Lasly, whose address is P. O. Box 2484, Conroe, Texas 77305-2484.

31.    John Doe 17 represents two boys, John Doe 17-A is Kevin McIntyre and John Doe 17-B is Sean McIntyre and the father of John Does 17 is Thomas McIntyre, who resides at 8522 Upton, San Antonio, Texas 78250.

32.    John Doe 18 is Peter Vigliano and the mother of John Doe 18 is Deborah Thomas-Vigliano, who resides at 7107-A Silverdale, Austin, Texas 78736.

33.    John Doe 19 is Toby Stroud and the mother of John Doe 19 is Janice Stroud, who

resides at 1502 Eagle Road, Weatherford, Texas 76087.

34.     John Doe 20 is Ryan Alcorn and the mother of Ryan Alcorn is Elizabeth Alcorn who resides at 5602 Sugar Hill, Houston, Texas 77056.

35.     John Doe 21 is Aaron Nefe and the mother of John Doe 21 is Gail Nefe, who resides at 17807 Theisswood Lane, Spring, Texas 77379.

36.     John Doe 22 is John Trice, Jr. and the father of John Doe 22 is John R. Trice, who resides at 2814 S. Surrey, Carrollton, TX 75006.

37.     John Doe 23 is Curtis Henderson and the mother of John Doe 23 is Bonnie L. Thiele, who resides at 708 West Brackenridge, Edna, Texas 77957.

38.     John Doe 24 is Stace McIntyre and the mother of John Doe 24 is Gail Madden, who resides at 3308 Glade Road, Colleyville, Texas 76034.

39.     John Doe 25 is David Aguilar and the mother of John Doe 25 is Susana S. Aguilar, who resides at 2213 Norma, Mission, Texas 78572.

40.     John Doe 26 is Samuel Campbell and the mother of John Doe 26 is Debra C. Morris, who resides at 21514 Morris, New Caney, Texas 77357.

41.     John Doe 27 is Justin Waltz and the mother of John Doe 27 is Susan Yarbrough, who resides at 229 Willow Bend, Huntsville, Texas 77340.

42.     John Doe 29 represents two boys, John Doe 29-A is Scott White and John Doe 29-B is Ben White and the mother of John Does XXIX is Arlene C. White, who resides at 8524 Bandera Circle E., Jacksonville, Florida 32244.

43.     John Doe 31 is Spencer Lanham and the mother of John Doe 31 is Tommye S. Lanham, who resides at 418 Swan Ridge, Duncanville, Texas 75137.

44.     John Doe 32 is Jim Dowell and the mother of John Doe 32 is Marian Dowell, who resides at 784 Old 36 Road, Bellville, Texas 77418.

45.     John Doe 33 is Ryan Martin and the mother of John Doe 33 is Candy Martin, who

resides at 1500 Gendanne Road, Carencro, Louisiana 70520.

46.     John Doe 34 is Damon Brown and the mother of John Doe 34 is Rhonda Brown, who resides at 3609 Mosswood, Conroe, Texas 77302.

47.     John Doe 35 is Joseph Gasner and the mother of John Doe 35 is Carol Gasner, who resides at 5237 Daytona, Garland, Texas 75043.

48.     John Doe 36 is Brandon Whiddon and the guardian of John Doe 36 is Paulette Hawkins, who resides at 325 Lakeside Lane, Nassau Bay, TX 77058.

49.     John Doe 37-B is Dan Campbell and his mother is Becky Campbell, who resides at 132 Sessions Drive, Aiken, South Carolina 29803.

50.     John Doe 38 is Richard Davis, Jr. and the father of John Doe 38 is R. E. Davis, Jr., who resides at 2151 Gruene Road, New Braunfels, Texas 78130.

51.     John Doe 40 is Robert Hunter and the father of John Doe 40 is Joe A. Hunter, who reside at 3301 Austin, Waco, Texas 76710.

52.     John Doe 41, Joshua Campbell, is deceased. Ms. Terri S. Campbell, who resides at 8815 Barrenway, Houston, Texas, 77064 was his mother.

53.     John Doe 42 is Jeffrey Snider and the father of John Doe 42 is Mark Snider, who resides at 8535 Honiley St., San Antonio, Texas 78250.

54.     John Doe 43 is Ryan Stout and the father of John Doe 43 is Earl R. Stout, who resides at 1710 Dewberry Brook Court, Kingwood, Texas, 77345.

55.     John Doe 44 is Thomas Mason, Jr. and the father of John Doe 44 is Thomas Mason, who resides at 125 Catalina Circle, Portland Texas, 78374.

56.     John Doe 46 is Layne Floria and the father of John Doe 46 is Sherwood Floria, who resides at 1235 Sunset View, San Antonio, Texas, 78258.

57.     John Doe 47 is Kenneth Kruckenberg and the mother of John Doe 47 is Laurie Abajian, who resides at 26895 Aliso Creek Rd. #B216, Aliso Viejo, California 92656.

58. John Doe 48 is ~~Cameron Nelson~~ and the mother of John Doe 48 is ~~Sandra Knott~~, who resides at ~~7540 East Via Estrella, Scottsdale, Arizona, 85258~~.

59. John Doe 49 is Daniel Wrider and the mother of John Doe 49 is Florida Rose Wrider, who resides at 18751 Walnut Hill, Conroe, Texas, 77302.

60. John Doe 50 is ~~Scott Navarre~~ and the father of John Doe 50 is ~~John Navarre~~, who resides at ~~128 Green Hills Trail South, Trophy Club, Texas, 76263~~.

61. John Doe 51 is ~~Sean Fagan~~ and the father of John Doe 51 is ~~Peter Fagan~~, who resides at ~~379 E. Ave., Coronado, California, 91228~~.

62. John Doe 52 is Joseph A. Arbini and the father of John Doe 52 is Jerrold E. Arbini, who resides at 1460 Robinson Dr., Red Bluff, California.

63. John Doe 53 is Shannon T. Lambert and father of John Doe 53 is Troy Lambert who resides at 12344 Longmire Trace, Conroe, TX 77304.


## III.
## FACTS

64. **John Doe 1** - (Justin Blanton, mother: Jeannette Blanton). Plaintiff Justin Blanton, was enrolled as a cadet at MMA between January of 1995 and March 8, 1995. Plaintiff Justin Blanton and his mother, Plaintiff Jeannette Blanton, selected Defendant MMA's program because Justin wanted to change his life. He wanted to gain better self-discipline and raise his ambitions. At the Defendants' recruiting presentation, Plaintiff Jeannette Blanton was given the impression that the young men at MMA would be under constant supervision. This representation was false. Plaintiff Justin Blanton, was exposed to drugs, physically abused, hit, slapped, kicked, punched, thrown, pushed, knocked out of his chair, had his nose badly injured, denied medical care, hazed, threatened, and gang beaten. He was locked in a closet, with only a mattress, for 24 hours by other cadets who were assigned to "physically train"(PT) him, without adult supervision, in the name of

discipline. After leaving MMA, Justin was a depressed young man numbing himself with drugs. Justin's relationship with his family has been severely damaged.

65.  <u>John Doe 2</u> - (Charles Ehm, Jr., parents: Charles and Carol Ehm) . Plaintiff Charles Ehm, Jr. first went to summer camp at MMA in 1993. He later attended MMA as a cadet from August 1994 to December 1994.  Plaintiff Charles Ehm, Jr. wanted to attend MMA because his uncle had attended in the early '70's and Plaintiff wanted to attend the U. S. Naval Academy.  His parents had been led to believe, by materials sent them by MMA that MMA was an academically superior academy with fine students and round-the-clock supervision.  After arriving at MMA, and prior to the Thanksgiving break, Plaintiff was repeatedly beaten in his own room by other cadets. Although the matter was brought to the attention of his Drill Instructor and Commandant Hobbs, Plaintiff Charles Ehm, Jr.'s parents, Plaintiffs Charles and Carol Ehm were never notified of any of these incidents. Plaintiff Charles Ehm, Jr. had many personal items stolen from his room. Since the cadets' room doors could not be locked. Plaintiff-Parents were led to believe, through admissions materials sent to them by MMA that no students would be accepted with a prior record of trouble or legal problems. These representations were false. Since leaving MMA, Charles failed all subjects in school, is disrespectful and aggressive. Charles experienced nightmares at least once a week for over a year.

66.  <u>John Doe 3</u> - (Ryan Foley, father: James P. Foley) Plaintiff Ryan Foley was a cadet at MMA from September 1994 to May 1995. Ryan's parents visited MMA and were very impressed with MMA's representations of a structured environment. They were told that their son would receive the supervision he needed. These representations were false. During the Plebe period and "Hell night" Ryan was assaulted by being hit hard in the eye while asleep by John Thomas McCoy. He was also the victim, on that same night, of having "ICY HOT" or similar balm placed without his consent, in his anus which caused intense burning and pain . Defendant Lt. Col. G.D. Andersen supposedly investigated this incident. In April or May of 1995, there was so little supervision that

Plaintiff Ryan Foley was sexually abused by Richard James Licata who ejaculated semen into Ryan's ear as he was talking to his mother on the telephone. Ryan was so upset he started crying. Ryan was also held down in April or May of 1995, near the Mess Hall, by two unknown cadets. They hit him with their fists in his stomach and arms leaving visible bruises. Those bruises were part of a continuing pattern of bruises over Ryan's body. Ryan's parents photographed these bruises during holiday visits. Ryan was constantly harassed physically and mentally. Ryan's stress level exacerbated his asthma and he experienced severe breathing problems. Ryan's roommate, Michael Risher notes he saw Foley with bruises on his body and noted Ryan looked like a "cheetah." Risher remembers that other cadets would hit Ryan for no reason. The Foleys have suffered financially and the whole family has suffered emotionally due to Ryan's experiences at MMA. Before going to MMA Ryan was a funny, nice boy with a sense of humor. Ryan came back from MMA a violent, aggressive and a disturbed child. Ryan continues to have problems sleeping. He also has had suicidal thoughts. His parents sent him to a private school in Utah where he received counseling. Ryan remains a depressed young man and has trouble getting or keeping a job.

67.    John Doe 4 - (Adam Rekerdres, parents: Ted and Carolyn Rekerdres). Plaintiff Adam Rekerdres attended MMA between the Fall of 1994 until May 14, 1996, just short of his graduation. MMA, specifically Defendant Col. Hobbs and Msgt. McLaughlin, represented to Plaintiff Carolyn Rekerdres, that MMA had a policy in place of "no tolerance" regarding drugs and alcohol. This representation was false, as both drugs and alcohol were readily available to anyone who wanted to obtain them. This included providing alcohol to minors. Defendant Col. Hobbs, acting as an agent for MMA, personally told Plaintiff Carolyn Rekerdres that no boy would be accepted by MMA if he had been in any kind of trouble. This information was false. MMA failed to warn Adam's parents that their son would be on his own much of the time, unsupervised and exposed to situations that were inappropriate for a child of his age. As a result of Adam's exposure to drugs at MMA, he left school before graduation which has affected his future.

While at MMA Adam was directed to be the disciplinarian for one class. This class consisted of several cadets who were considered unruly by the administration. Adam also talked to Doe 37-B James Campbell shortly after James was victim of a sexual assault by Defendant Butler. Rekerdres found another cadet, Doe 52 Joseph Arbini, curled up in the shower in full uniform. After seeing how distraught the cadet was, he tried to get cadet Arbini to tell him what was wrong. The cadet kept saying that Defendant, Col Hobbs said that he and anyone he told, would get in big trouble. Adam finally got the cadet to talk about the sexual assault that had happened to him while on liberty in town. The cadet had reported the assault to Defendant Col. Hobbs and his Drill Instructor. He was told to keep quiet about it. Adam convinced the cadet to call 911.

It was after this event that the urinalysis was ordered on Adam and he was told to resign or he would be expelled just weeks before his graduation. Adam had been a leader at the academy. He has been damaged by MMA, including his reputation. He and his family were promised the urinalysis would be kept confidential if he would just resign from the school. Defendant Col. Hobbs and other school personnel did not keep this information confidential. Defendants breached their duty to Plaintiffs Adam, Ted and Carolyn Rekerdres, and in doing so they violated the Family Educational Rights and Privacy Act (FERPA). Such violation of FERPA constitutes negligence per se for which Defendant MMA is liable.

68.   <u>John Doe 5</u> - (Michael Risher, father: Von Michael Risher) Plaintiff Michael Risher went to summer camp at MMA in 1993. He became a cadet at MMA during summer school of 1994 to January, 1995, his 9th grade year. His parents attended a recruiting meeting at a hotel in Dallas, Texas. MMA represented in the "Right Guide," that the cadets' rooms would be private and that except for an assigned roommate, no one could enter their son's room without his permission. These representations were false. In fact, anyone who wanted to could come in, at any time, and do anything he wanted (even take anything he wanted.) Michael was physically ill for well over a month before his parents were informed. Michael went to the MMA infirmary several times and

was turned away because MMA used a defective thermometer to take his temperature. MMA and its medical staff failed to diagnose Michael's illness. Finally, in the fall of 1994, Michael was told by a medical staff person at MMA, that they had determined that the thermometer was broken. Michael was finally admitted to the hospital, with a temperature of 105.3 degrees, for three days. Michael was denied appropriate medical care at MMA, and as a result he became extremely ill. The illness persisted for several months, during which time he lost over 45 pounds (25 pounds of which was lost the first month he was sick).

Michael was hit in the mouth by another cadet and chipped a tooth. On another occasion he was knocked unconscious. While at MMA, Michael saw Plaintiff Ryan Foley beaten by the older cadets. One time he saw Foley with his shirt off and told him he looked like a cheetah because he had so many bruises.

69.    John Doe 6 - (Wyatt Turner, mother: Candace Wyatt). Plaintiff Wyatt Turner was a cadet at MMA between the August of 1995 until August 26, 1996. Wyatt's mother was assured by Drill Instructor Hughes and other staff members that her son would be well supervised while at MMA . This representation was false. He was assaulted, beaten, and witnessed the beatings of other cadets. He and his fellow cadets were left unsupervised for periods of time both in the barracks and on camping trips. While at MMA, Wyatt was offered drugs by other students.

70.    John Doe 7 - (James Varas, parents: Perry and Anna Owens).    Plaintiff James Varas attended MMA as a cadet from August 1991 until May 1995. James' parents were told, and informed through admissions and promotional materials that MMA had an excellent academic program.  At the recruitment meeting, MMA claimed to have the top 1% of national merit scholarship students in the nation. MMA also claimed to have a superior study environment, supervised study quarters, without distractions, such as radios, etc. One of the primary reasons Plaintiff James Varas' parents sent him to MMA was the claim that MMA had the power of "appointment" to service academies. James' dream was to go to one of the service Academies and

become an officer in the military as a career. While at MMA, Plaintiff James Varas was subjected to repeated physical harassment, denied medical care, and forced to sleep outside on one or more occasions. He was denied a scholarship that MMA promised to award him due to a clerical error on the part of MMA. After Plaintiff James Varas had completed the work necessary to get the offered scholarship, MMA negligently lost their own internal records, and then denied him the promised scholarship on the grounds that they did not have his records. Plaintiff Varas was a leader at the school during his tenure there, until he became so despondent and depressed due to the behavior and intimidation that was required to be a leader. He was disillusioned with the school and felt betrayed by Sgt. Pruitt, for talking about him to other boys, calling him lazy. He had a mental breakdown in the Spring of 1995 and shaved his head in the shower. In the summer of 1994, James attended camp at a service Academy. It was there he realized that the tenets MMA was teaching its cadets were not honorable. He has been despondent and depressed ever since due to the mental abuse and emotional trauma he had at MMA. His family and James struggle daily with the loss and betrayal they feel for the destruction of the career of a morally and intellectually excellent young man.

71.    John Doe 8 - (Eric Westbrook, parents: Mr. & Mrs. Elzie Westbrook). Plaintiff Eric Westbrook was a cadet at MMA between August, 1994 and January 26, 1996. Eric Westbrook's parents sent their son to MMA for discipline and supervision. Through materials MMA sent to the Westbrooks, they were led to believe that Eric would have a better chance for a career in the United States Marine Corps. MMA's representations of adult supervision were false.

While at MMA, Eric was repeatedly beaten, emotionally abused, and mentally abused. Eric had a noose tied around his neck and was subjected to racial slurs such as "nigger" by other cadets. Eric returned from MMA a child who abused alcohol, rarely smiles, is withdrawn , aggressive, and uses profanity. Eric's parents witnessed severe bruises on him on one or more occasions. While at MMA, Eric was also given access to drugs and alcohol.

72.   <u>John Doe 9</u> - (Mark Woods, parents: Mark and Carrie Woods). Plaintiff Mark

Woods was a cadet at MMA from August 1995- January 1996. Mark's parents attended a

recruiting meeting for the Marine Military Academy in Houston, Texas. MMA represented to

Mark's parents that MMA was affiliated with the United States Marine Corps. Much of the

literature and information distributed to the parents bears the United States Marine Corps Emblem.

MMA represented that they provided a secure and well supervised environment. MMA also

promised the Woods that there would be no hazing or intimidation used. These representations

were false.

While at MMA, Plaintiff Mark Woods was assaulted, beaten, hazed, threatened, pulled

from a shower naked and beaten by several other cadets, verbally and mentally abused, and degraded

mentally and physically. Mark witnessed the hazing of other cadets. D.I. Hughes took pictures of

Mark's injuries. After one assault to him, Mark sustained a tooth injury which required several

procedures to repair. Mark was beaten violently by a cadet named Gonzales on December 11,

1995. Defendant Col. Andresen wrote a memo to Defendant Hobbs regarding the assault on Mark

Woods by Corporal Gonzales. Defendant Andresen's report provided Defendant Hobbs and

Defendant MMA with the knowledge of the condition and deterioration of the school. He wrote:

"That statements by witnesses indicate that MMA is admitting a number of undesirable kids

who have a history of previous drug use and arrests."

However, Mark had to stay in the same barracks with Gonzales for the few weeks following

the assault. He stayed awake for three nights before the Christmas break because Gonzales

continued to threaten him. Mark did not return to MMA after the holidays. After leaving MMA,

Mark suffered from headaches, depression and began experimenting with drugs and alcohol.

73.   <u>John Doe 10</u> - (Jason Null, mother: Linda Champion). Plaintiff Jason Null attended

MMA from August, 1994-January 31, 1997. MMA represented to Jason's parents that he would

be in a safe, adult supervised environment. This representation was false. Drugs were easily

accessible to cadets.

Jason's arm was broken while at MMA. MMA school officials never notified his parents of Jason's broken arm or any other injury sustained by him. Jason was also "tapped in" in the head after plebe week. Jason's Drill Instructor directed other cadets to take him into the T.V. room, turn off the lights, and give him a "blanket party". There were other occasions on which Jason was assaulted, hit, knocked to the floor. Jason was also taken to Mexico by his MMA football coach without his mother's permission. Since leaving MMA, Jason has been depressed and suicidal. He has uncontrollable rages, has difficulty accepting authority, and has abused alcohol.

74.   <u>John Doe 11</u> -   (Kristopher Johnson, mother: Jan Baker) Plaintiff Kristopher Johnson attended MMA between August of 1994 to January of 1995, while he was in the ninth (9th) grade. In the Summer of 1994, Kris's mother went to a presentation at the Holiday Inn on LBJ in Dallas, Texas. There were cadets there (in uniform) who talked about their grades and attitudes having improved because of MMA. All through the presentation, and later in a tour through MMA, the family was repeatedly told that MMA was structured and well-supervised. Master Sgt. McLaughlin told Kris' parents that the school did not accept boys with criminal records or even with troubled lives. The family later discovered, that there were many boys enrolled at MMA who had criminal records and/or troubled lives. Kris' parents would never have sent their son to MMA if they had known the truth.

Kris was given access to alcohol and started drinking at MMA for the first time. Because of the lack of supervision, Kris was able to go to Mexico during weekend liberty with older boys. Two of whom were William Hannan and Walter Teague, senior leaders at MMA. The boys went to Mexico by leaving on liberty and just walking through the turnstile. They often stayed in Mexico as long as eight (8) hours. The boys believed that the Drill Instructors and staff knew about the trips to Mexico as it was shouted through the halls and talked about in front of the staff, including Drill Instructor MSgt. Rombkowski.

Kris was assaulted, beaten, physically abused, hazed, and became the victim of a "blanket party" which started while he was sleeping. He was sound asleep and was awaken by three or four cadets holding him down and putting duct tape over his mouth and a pillow over his face. They beat him with socks with bars of soap in them. They told Kris if he told, that they would kill him. He did not tell his parents or the drill instructor about it. The "blanket party" was the result of Kris scratching another cadet's shoe. Kris was injured several other times, (including receiving a gash on his head,) but his parents were not notified of any injuries to him. Kris also witnessed other cadets being hazed. One roommate slept in his locker with it locked all night because he had trouble earlier in the day with some cadets. He told Kris to unlock it the next morning.

75. __John Doe 12__ - (Alan Everett (Rett) Gray, mother: Pat Gray) . Plaintiff Alan Everett (Rett) Gray was a cadet at MMA between January 1994 to March of 1995. Rett's parents attended a recruiting meeting and were led to believe that MMA provided a disciplined, structured, highly supervised environment. MMA promised Rett's parents that boys with criminal pasts were not accepted at MMA, that the boys did not go to Mexico and that there would be confirmation classes available to Rett. These representations were false.

Rett was allowed to go to Mexico, took air flights to other parts of the state, was given access to alcohol, and was not supervised. He was hazed, "tapped in," had staples driven through his arm as part of a hazing ritual, Rett was degraded verbally, and witnessed the hazing of other cadets. Rett was locked in a cold room without a shirt and was told that he would be there for a few days. Rett began singing loudly off-key and was finally let out o f the locked cold room in the middle of the night. Had there been. adequate adult supervision as promised by MMA none of this would have occurred.

76. __John Doe 13__ - (John Crumby, mother: Elizabeth Blum). Plaintiff John Crumby was a cadet at MMA from August 1993 to May 1994. His family attended a recruitment meeting at the Summit Hotel in the spring of 1992. John and his family were told that MMA had small classes,

with very good instructors, and that a very heavy emphasis was placed on after-hour studies. John and his family were also told that during the study hall the Drill Instructor would check to make sure that the boys were studying what they should be. These representations were false.

John was assaulted several times, sometimes at night when the Drill Instructors were not available and there was no other adult supervision present. John's parents received a call from MMA informing them that he had been involved in a minor incident which resulted in his being admitted to the Infirmary overnight, for a bruised jaw. The actual fact was that John had been held in the Infirmary for a week due to a severe beating. For most of that time, he could not even walk. John's injuries were the result of one of the after-effects from the "blanket party" assault. During this assault, blows were directed towards his genitals which has left a mass of scar tissue in his testicles. John will need surgery and it is possible that he is sterile. None of this would have happened had there been the adult supervision as promised by MMA. The doctors' notes, made on November 18, 1993, included the word "assault."

77.   John Doe 14 - (Enrique Molina, Jr., father: Enrique Molina, Sr.).   Plaintiff Enrique Molina, Jr. attended MMA as a cadet between August 1995 and May 1996. MMA represented to Enrique's parents that MMA was directly affiliated with the United States Marine Corps, and stood for the ideals of the Marines.   Enrique's parents were also told that MMA's academic quality was held at an extremely high standard. These representations were false.

Enrique was in constant fear of retaliation by other cadets. Enrique, a Hispanic, experienced racism by other cadets of higher rank in the form of constant racial slurs which often contained sexual references. Racist behavior and comments were directed towards Enrique. Other cadets regularly urinated in Enrique's bed and tore up his bed and locker. The ideals of the United States Marine Corps were not upheld. Enrique witnessed numerous beatings of other cadets as well as rampant drug use. Enrique suffered weight loss, sleeplessness, and nausea. Enrique returned from MMA a troubled young man who is disrespectful and angry.

78.     John Doe 15 - (~~Gary Palmer, Jr.~~, parents: ~~Gary and Caroline Palmer~~) John Doe 15, attended MMA the month of January 1997. The parents of John Doe 15, sent their son to MMA because he wanted to be a Marine. They had seen an article about MMA in the Houston newspaper, advertising a recruitment presentation in Houston. The ad said that MMA could turn boys into men, that grade averages would be improved, that boys who attended MMA would have a better chance of being accepted to prestigious colleges, and that they their careers in the military would be advanced. The ad ran in the Houston Chronicle in October 1996.

When the ~~Palmers~~ were notified by MMA that their son had been accepted, ~~Mrs. Palmer~~ called to verify the information. Whoever answered the phone in the office verified that ~~Gary Palmer, Jr.~~ had been accepted. However, when they arrived on registration day, John Doe 15 was not enrolled in any classes nor was he assigned a barracks. MMA finally got straightened it out and ~~Gary~~ was allowed to be enrolled and was placed in a room with two other cadets. It was not until John Doe 15's parents received the records, during the course of this lawsuit, that they discovered that their son had originally been rejected by the academic department due to his learning disabilities and his inability to succeed at MMA. John Doe 15 did not succeed at MMA and the school made over $5,000 in a few weeks time.

While at MMA, John Doe 15 was beat on his hands with soap bars by other cadets while he was in the shower. He was threatened by older cadets, Lt. H_____, Lt. H_____, and Private E_____, who told John Doe 15 that they would put him in the hospital and he would wish he were dead. One of these older boys was the "Commanding Officer" (CO) in charge. John Doe 15 was threatened and assaulted many other times. The Chaplain, Drill Instructor Pruitt, and Gen. Glasgow were told of these threats and assaults, but nothing was ever done. John Doe 15's father called Sgt. Pruitt and told him that his son was in fear for his life and that he had been threatened. ~~Gary Palmer, Sr.~~ also called the Chaplain to tell him that his son felt his life was in danger. The MMA chaplain refused to check on John Doe 15 and told his father that he would need to make an appointment to

come to see him "next week."

After those calls, John Doe 15 was awakened during the night, beaten, kicked in the testicles. He ran away the day after he was beaten up because he was told by another cadet that after John Doe 15 fell asleep that night he would be "...taken care of". On January, 30, 1997, John Doe 15 was found by the police and taken back to MMA the following day. MMA materially misrepresented the nature and extent of John Doe 15's injuries and abuse and the complete lack of adult supervision to his parents .

79.    **John Doe 16** - (Ronnie Easly, mother:  Ramona Easly) John Doe 16 attended MMA from August 1997 to November 1997. MMA made claims to parents that led the parents to believe that their sons were safe and supervised at MMA. John Doe 16's mother was told that he would have a better chance of getting into the Naval Academy.   These were misleading statements. John Doe 16 was given access to drugs at MMA. At MMA, John Doe 16 was also assaulted, verbally abused, shamed and humiliated. He and his roommate were the only two 8th graders on the top deck of their barracks and they were terrorized by the older boys. At the end of his Plebe training, his plebe class was "tapped in." The older cadets hit the cadet's pins on their head. They would walk by and hit the pin up against the plebe's head. D. L. Clarke broke it up when a cadet started bleeding from his head. He was so depressed after his plebe training, that he tried to commit suicide with a razor. John Doe 16 was exposed to drugs as an 8th grader at MMA. On the weekend, marijuana and cocaine was consumed by many of the cadets.   He had his $150 CD player stolen while at MMA. Theft was very common. Once he and his roommate were attacked by cadets with homemade dart guns. The dart guns were made from the cardboard from a coat hanger. The tip from a shoelace attached to a sewing needle made the dart. He and his 8th grade roommate were asleep when a group of older cadets barged in, tore off their sheets and peppered them with the darts blown from their homemade dart guns. He had several needles stuck in him. He was told he would get his ass kicked if he told anyone about it. He was extremely afraid at night while at MMA.

80.  **John Doe 17-A and B** - (John Doe 17-A is Kevin McIntyre and John Doe 17-B is Sean McIntyre, parents: Tom and Marlene McIntyre) Plaintiffs Tom and Marlene McIntyre had two boys, who attended MMA. Kevin McIntyre attended MMA from January 1994 through May of 1996 and he has sued MMA individually. Sean McIntyre attended MMA from Fall of 1993 to May of 1997. The family chose to send their sons to MMA because MMA promised structure and the United States Marine Corps' standards, leadership and discipline. These representations were false. MMA had complete and blatant disregard for Marine Corps concepts. The environment at MMA was not structured or supervised. Sean McIntyre, Kevin's brother, returned home with cigarette burns on his arms and back, and Kevin's parents saw bruises on his body on numerous occasions. Kevin was not given the academic support the family was promised. Kevin was assaulted by other cadets, who beat him with locks in socks. Kevin and Sean both had "tapping in" experiences. Sean was doing great in academics until he started dating his Drill Instructor's (Sgt. Frank Fonte) daughter, Sandy. This relationship was against the rules and the McIntyres complained about the relationship. This situation put a strain on their relationship with Sean. Sean's grades went down extremely after the advent of this relationship, because of the special treatment he received due to this relationship.

81.  **John Doe 18** - (Peter Vigliano, mother: Deborah Thomas-Vigliano) John Doe 18 attended MMA from January 1996 to April 1996. MMA represented that all the boys would be well-supervised so that hazing incidents could not occur. Accounts of hazing were represented to the family as minimal and isolated occurrences. While John Doe 18 was there, he was beaten and forced to proceed down a central hallway while naked and being verbally degraded. Some of his personal property was stolen. An example of the daily harassment he endured is that when he tried to talk on the telephone, other cadets would rip it out of his hands and hang it up. He was threatened and still fears retaliation for any action taken against MMA. The cycle of abuse at MMA is perpetuated. After younger boys, (who have been mistreated,) get power and rank, they believe

it is their "turn" to pass on the abuse, they themselves have experienced, in the name of discipline. He and his roommate were made to eat an entire pack of cigarettes until they threw up. But when they both did not vomit, they were made to spin around and around until they did. They were told to throw their vomit on each other.

82.   <u>John Doe 19</u> - (Toby Stroud, mother: Janice Stroud) John Doe 19 attended MMA from August of 1995 to Spring of 1996. The family was sent promotional materials which claimed to improve students' focus and help academically challenged students improve their grades. During the enrollment process, the ability to control students with ADD and the ability to deal with ADD problems was reinforced. Drill Instructor Chamberlain told the family that the structure of MMA would help with John Doe 19's ADD. The family also talked with MMA teachers about help with John Doe 19's ADD. MMA represented that because of John Doe 19's ADD, he would get a better education at MMA. This was based on the fact that they had smaller classes and supervised study periods. While at MMA, John Doe 19 was subjected to battery of his genitals. After being repeatedly assaulted, and threatened by other cadets, John Doe 19 ran away. His parents took pictures of his bruises, and of his roommate's black eye. John Doe 19 once called his parents from Harlingen and reported that he had been stranded on weekend liberty. He wanted to know if he should get a hotel, because he had no way to return to campus. This would not have happened if there had been proper adult supervision as claimed.

83.   <u>John Doe 20</u> - (Ryan Alcorn, mother: Elizabeth Alcorn) Plaintiff Ryan Alcorn attended MMA from January of 1994 to January of 1995. The family chose MMA after they received admissions materials which represented that MMA had an excellent academic program, and as well as offering a wide variety of elective courses, such as skydiving. When Plaintiff Ryan Alcorn arrived at MMA, Drill Instructor McFarland told him that skydiving was available. However, Ryan was never given the opportunity to take the class. The scholastic challenges he encountered were far less than at other academies he had attended, such as St. Thomas and Lamar.

CSMPDF - www.fastio.com

Because of insufficient adult supervision, Ryan was able to often skip. He thought that the quality

of the teachers employed at MMA were lower than at other academies and that their credentials

should be examined. MMA was not a safe place for him. He was assaulted and hazed constantly.

Several assaults were directed at his genitals.

84.    John Doe 21 - (Aaron Nefe, mother: Gail Nefe) Plaintiff Aaron Nefe attended MMA

in 1996 and 1997. He also attended MMA's summer camp, and based on that experience, the family

withdrew $25,000 from a retirement fund and enrolled him for the school year. The family did not

realize that there was a severe lack of adult supervision, especially during weekend liberty. Nefe

later told the family that he had gone alone into town. Representations by MMA of adequate adult

supervision were false. The family chose MMA based on those representation. At MMA, he access

to drugs, alcohol, cigarettes, and vulgarity. The students were able travel to Mexico, because they

were not supervised during Liberty. Plaintiff Aaron Nefe also witnessed the hazing and abuse of

other cadets.

85.    John Doe 22 - (John Trice, Jr., father: John Trice, Sr.) Plaintiff John Trice, Jr.

attended MMA in 1992 and 1993. The family chose MMA because they were given the impression

that MMA provided a rigorously structured, highly supervised living environment for the boys.

These representations were false. John Doe 22 was hazed, robbed, choked, beaten, made to stand

at attention while being lit on fire with lighter fluid. He was forced to watch while a friend and

fellow cadet, Joseph Gassner, was so severely beaten by other cadets that he suffered a concussion

and had his teeth knocked out.

86.    John Doe 23 - (Curtis Henderson, mother: Bonnie Theile)John Doe 23 attended

MMA from January of 1996 and January of 1997. His mother spent retirement savings to send him

to MMA because the family had been led to believe that he would be in a structured and

academically excellent environment. They were assured that his grades would improve, and that

he would become more disciplined and responsible. At MMA, John Doe 23 was treated with a

complete lack of respect, had his personal belongings stolen, was beaten for not giving his food to another cadet. On one occasion the Harlingen police came to MMA and reportedly found 158 pills of some type of drug, and several ounces of marijuana in his barracks. More drugs were found in the room of two cadets who fled. John Doe 23 wrote his mother the next day, detailing what had happened. He wrote that the Drill Instructor had been present for the search. This occurred on April 15, 1996. The family never heard from MMA concerning this incident.

87.   <u>John Doe 24</u> - (Stace McIntyre, mother: Gail Madden) Plaintiff Stace McIntyre attended MMA January, 1997. The family chose to send him to MMA after attending a local recruitment meeting and then visiting the Campus of MMA. The information MMA gave them, both verbally and in writing stated that the school was one that helped young men learn self-discipline in an academically challenging environment. The family was also told that every effort was made to help cadets adjust to the environment at MMA. These representations were false. The barracks were overcrowded. In Plaintiff Stace McIntyre's room, three boys were assigned to a room that was designed and advertised to hold two boys. This continued until after the plebe period. MMA stressed that "...they did not admit just anyone", but the family later found out that MMA admitted boys with severe problems. Plaintiff Stace McIntyre's family was lied to regarding the disappearance of Plaintiff Stace McIntyre from MMA. His mother was not informed of his disappearance until she arrived at the MMA campus to visit him, and at that time was informed that he was missing. After being questioned by Plaintiff Gail Madden, Stace McIntyre's mother, the Drill Instructor indicated the police had been called. A trip to the police station revealed that the police had no record of any report ever being filed. The dispatcher said it was common for boys to run away from MMA, and that a lot had. Later, the Drill Instructor filed a missing persons report. After Plaintiff Stace McIntyre's mother had left town, (according to the Police Investigator assigned, possibly named "Martinez,") the Drill Instructor called to have that report canceled, as he told the investigator, the boy was a juvenile. The investigator called Plaintiff Stace McIntyre's mother, and

she asked to get the report re-filed. While at MMA, Plaintiff Stace McIntyre was assaulted. He received blows which were primarily directed at his genitals. He was made to scream obscene phrases, under threat of being beaten by other cadets.

88.   <u>John Doe 25</u> - (David Aguilar, mother: Susana Aguilar)Plaintiff David Aguilar attended MMA from the Fall of 1992 through Spring of 1994. His mother chose MMA because she wanted her child to attend a good school in the United States. MMA represented that it provided close adult supervision. They also promised excellent academics. On his first night at MMA, three cadets, two of which were named David Medina and Brian Andrew Leskousky, placed a sword to Plaintiff Aguilar's penis and twirled it around, while threatening him. The following day, he was "tapped in" by Cadet Medina. He was subsequently "tapped in" by Medina, Leskousky and Cadet Hardaway on multiple occasions. Plaintiff Aguilar was assaulted in November of 1993 by Cadet Rubalcaba, who sprayed Aguilar with some type of chemical until his foot burned. While in class, Plaintiff Aguilar was poked in the left eye by Cadet Eagliar. He went to the MMA clinic and was kept there for two days. While at the infirmary, he was reported as "AWOL" and missing from campus. His parents were notified of this. After his parents drove from Mexico to investigate, Sgt. Garza admitted to them that Aguilar had been in the infirmary for two days, because he had been stabbed in the eye with a pencil. Plaintiff Aguilar was repeatedly threatened, physically assaulted and a victim of extortion from other cadets. He was also the victim of a "blanket party." Three of the cadets who participated in these activities against Plaintiff Aguilar were Cadet David Medina, Cadet Leskousky and Cadet Baglionni. These three individuals were turned into D.I. Durham by Plaintiff Aguilar. He also had his telephone card stolen by Cadet Leskousky and Cadet Austin Abel Smith on two separate occasions, where they charged approximately $1,500.00 in calls. There was an investigation performed by the D.I. and restitution of not even ½ of the amount charged was paid to the Aguilars. Plaintiff Aguilar lived in fear of being harmed and in fear of retribution from the other cadets when he reported their actions against him. After several visits, Plaintiff David

Aguilar's mother learned that he was being harassed and threatened and that he would not sleep because he was afraid someone would harm him. Plaintiff Aguilar also witnessed physical assaults on other cadets, performed by cadets in leadership and Drill Instructor(s).

89.    **John Doe 26** - (Samuel Campbell, mother: Debra Morris) Plaintiff Samuel Campbell attended MMA between August 1995 until November 1997. He wanted to go to MMA because the family was led to believe, through advertisements and recruitment materials, that MMA had an excellent academic program, as well as great athletic programs in a safe and adult supervised environment. The family withdrew him after another cadets' throat was slashed (Cortez incident). After this incident, the cadets were not allowed to call home. He was in the same barracks as Cortez. It had been a concern before, because he had told his parents that he was not allowed to call during the week. But when he was not allowed to call home after the Cortez incident, it became apparent that MMA was not a safe environment and that Plaintiff Samuel Campbell was in danger. His family withdrew him from MMA. Later, Plaintiff Samuel Campbell admitted that he had been beaten up and that MMA accepted boys who had problems, including criminal records. He was punished by being awakened every two hours and made to do P.T. After that he could not go to sleep because his adrenaline was still pumping. He was deprived of sleep for days. He did not have trouble sleeping before MMA, but has since his time at MMA. The attitude of the staff was cavalier. In one instance, the Drill Instructor Clark called Sam's mother and stated, "I just called to let you know I don't know where your son is." The fact that the parents were not notified after the Cortez incident, (which was also a concern of other parents who attended MMA's Ball,) and that the families had to learn of the incident on the Internet, was deeply troubling. Plaintiff Samuel Campbell's mother asked the Drill Instructor to have Plaintiff Samuel Campbell call her after the throat-slashing incident, and her son was not allowed to do so. This was inexcusable.

90.    **John Doe 27** - (Justin Waltz, mother: Susan Yarbrough) John Doe 27 attended MMA the Spring of 1997 and a short time in the Fall of 1997. He was sent to MMA because they

advertised structured environment, control of the student population and thorough supervision. They were also promised that he could enroll in skydiving, scuba diving and skeet shooting. Of the three activities mentioned, the only activity that was available to Justin was on one afternoon exercise, he was allowed to use scuba gear in a swimming pool. John Doe 27's family were promised verbally and in written literature that their son would be supervised totally and that his attitude, grades, and his sense of responsibility would improve. Instead, he regularly left campus unsupervised and went to Mexico. He was given access to drugs and alcohol. Eventually, after running away, he was sent home in handcuffs (which were put on him by Drill Instructor Ron Chamberlain and left on him for a number of hours.)

91.   **John Doe 29** - ( John Doe 29-A is Scott White and John Doe 29-B is Ben White; mother: Arlene White). John Doe 29 represents two boys, John Doe 29-A is Plaintiff Scott White and John Doe 29-B is Plaintiff Ben White. Their father was a football coach at MMA from 1994 through part of 1996, and as a result both sons attended MMA. Plaintiff Scott White, the older son, attended MMA from August, 1994 through September 6, 1996. Plaintiff Ben White attended MMA from September, 1995-September 6, 1996. The younger son, John Doe 29-B, because he was in the 6th grade, only attended one year and one month. Although the family lived near the boys, and were there with them on campus, they were still subjected to verbal and physical abuse, drugs, obscenity, gang fights, humiliation, degradation, assaults and hazing, which resulted in the younger son, Plaintiff Ben White, having his nose broken and a tooth knocked out. The older son, Plaintiff Scott White, was severely emotionally abused. Once when some boys were playing a prank on him, they sprayed his back with lighter fluid and ignited it, causing a fireball to engulf Plaintiff Scott White's head. The lack of supervision in the barracks was unbelievable. At one point, Plaintiff Scott White was denied medical care, while running a fever. Although his Drill Instructor Fonte, knew he was ill, the older son was not allowed to contact his parents. At a football game, he managed to come to them. At that point he was dehydrated, his eyes were glassy, and he was

obviously ill.   After that, the decision was made to pull him out.  Both sons were severely and emotionally abused at MMA, and the repercussions are still being dealt with by the family.

92.   <u>John Doe 31</u> - (Spencer Lanham, mother:  Tommye Lanham) Plaintiff Spencer Lanham attended MMA the fall of 1997. John Doe 31's parents chose MMA based on assurances by MMA that they provided an excellent education and constant adult supervision.  The family had been promised by the Commandant (while they sat in the Registrar's office) that Doe 31 would get to play golf and do a lot of other extra-curricular activities like rifle classes.  He was never allowed to do those activities.  While at MMA, he was hazed in the name of discipline.  He was beaten so severely that he passed blood in his urine afterwards.  His scalp was severely skinned in another assault.  He was choked and thrown against the wall.  He witnessed  numerous beatings of other cadets.   The classes at MMA were substandard compared with the classes he had attended previously, (closer to "remedial" than "excellence.")  When complaining about the lack of adult supervision and substandard academics,  parents were treated rudely by various members of the staff, including Mr. Lanoue.

93.   <u>John Doe 32</u> - (Jim Dowell, mother:  Marian Dowell) John Doe 32 attended MMA from the summer of 1997 to the fall of 1997.  He attended MMA for three weeks.  He was and still is a straight A student and a member of the National Junior Honor Society.  He wanted to attend a military academy to be part of an excellent JROTC program and to expand his education.  Doe 32 and his parents went to the MMA orientation in Houston where MMA promoters described the school as a place where boys can get an outstanding education and an abundance of self-esteem and leadership through rising in the ranks and being a part of a company.  The academy also stated that they were allotted 6 appointments to the Naval Academy, second only to the President of the United States, and 5 appointments to West Point.  They also said they would not take anyone who was in trouble with the law.  When he arrived at the school it was a different story.  He was rarely able to call his parents.  He was reprimanded for using the phone.  His cadet leader was the boy who later

was accused of slitting a boy's throat. He witnessed assaults and hazing and was in danger while he attended MMA.

94.   **John Doe 33** - (Ryan Martin, parents: Danny and Candy Martin) John Doe 33 attended MMA from August 1997 through December 1997. The family chose MMA because the school advertised and sent out literature claiming that they could improve GPA's. MMA further promised that MMA was an environment that would build character, self-discipline and a sense of responsibility. The family was also assured that at MMA the boys would be constantly monitored and supervised. These assurances were false. While at MMA, John Doe 33 was assaulted twice in the same day by Company Commander of Charlie Company Landon K. Hardin. He was assaulted once in the mess hall, by having a knife thrown at him (and hitting him in the back) while on kitchen duty and later  assaulted in his room in Bravo Company because Cadet Hardin was supposedly attempting to locate a few packages his mother had incorrectly mailed him at Bravo Company. When John Doe 33 told Cadet Hardin he didn't know anything about the missing packages, Cadet Landin put his hands around John Doe 33's neck, pinned him against the wall and lifted him off the ground. While assaulting him, he threatened him and another cadet with retaliation for the missing packages. John Doe 33's mother was at MMA at the time, to pick up her son for liberty. Doe 33 was terrified to leave the barracks because he thought Cadet Landin was still around and would physically assault him again. Even after Sgt. Mjr. Krauss prepared a memo requesting Landin be considered for dismissal (noting his apparent disregard for the "rules" at MMA and putting other cadets in harms way), MMA chose only to punish Landin with nominal demerits, 48 hour restriction and reduction in rank. MMA gave a copy of Sgt. Mjr. Krauss' memo to John Doe 33's family. Upon representation that Cadet Landin would be dismissed and/or harshly dealt with because of his assault of John Doe 33, his father decided not to press criminal charges against Cadet Landin, who was a larger and older cadet than his son. After Landin was disciplined, John Doe 33 was threatened with serious harm by Cadet Landin's friends. Additionally, and in separate occurrences, John Doe

33 was threatened, assaulted, and hazed. As a member of the boxing team, John Doe 33 was jogging with the team one day. He told Cadet Arceneaux (leadership) that his stomach hurt and he could not keep up. Arceneaux said John Doe 33 was going to keep up, took him by the arm and dragged him up to the group and hit him twice in the head.

John Doe 33 witnessed other cadets being hazed, for example, sometime after Plebe graduation Cadet Billando lost his glasses. Sgt. Mjr. Pruitt ordered a search of all cadets' rooms and said that no one could leave for liberty until the glasses were found. While the cadets in leadership searched the rooms, John Doe 33 saw Cadet Arceneaux go into Cadet Supavoda's room, (directly across the hall from John Doe 33's room) approach Supavoda, twist his arm back to his back and push him to the ground. While on the ground, Arceneaux pushed Supavoda's arm up so high that John Doe 33 heard a "popping" sound. Arceneaux also had Supavoda's throat so tight that there were visible bruises later. Arceneaux threatened Supavoda about the missing glasses, about his liberty being delayed and that he'd better have nothing to do with it. The glasses were later found. John Doe 33 lived in such fear of being harmed every night that he never slept without some type of weapon close at hand. The parents became aware, from later conversations with a Drill Instructor's wife, that other Drill Instructors also felt that there needed to be more supervision and had repeatedly asked the school for additional adult staffing. John Doe 33 learned to not care about anything. He has a sign on his bedroom door today that reads, "If you don't care, they can't hurt you."

95.    **John Doe 34** - (Damon Brown, mother: Rhonda Brown) John Doe 34 attended MMA from August 17, 1996 until September 24, 1997. The family applied to MMA because they had received information from MMA that led them to believe that MMA had an excellent academic program. They were also given literature that gave the impression that MMA only took good kids. MMA represented that they maintained a highly disciplined and structured environment due to experienced drill instructors who supervised the boys 24 hours a day, seven days a week and who

lived on premises with the boys as surrogate parents. Because the families were all told that it was common for the boys to exaggerate their experiences at MMA in letters and communications, John Doe 34's parents did not believe him when he described "blanket parties," beatings, hazing, the availability of drugs, and the fact that he had to sleep with a pipe under his pillow for protection. John Doe 34 felt betrayed and abandoned by his parents. Before Christmas of his first semester, he was completely disillusioned and felt isolated from his family. This experience caused considerable damage to the relationship that John Doe 34 had with his parents. He was driven away from his parents. John Doe 34 was made to walk tours almost every weekend (two hours of marching with a rifle without being able to adjust it at all while the strap cuts into the cadet's shoulder). One Saturday afternoon, he was marching tours, when his Drill Instructor Sgt. Clark came up to him and said with a sardonic grin on his face, "I have a surprise for you." He would not tell John Doe 34 what it was and made him continue to march. Afterwards, John Doe 34 snuck away to call his mother. She told him his father had been in a serious car wreck and was in the hospital. He was at first angry with her for not calling her. Then she told him that she had called Sgt Clark and had asked him to have him call her. Mr. and Mrs. John Doe 34's parents sacrificed financially in order for their son to go to this school where his future could be improved, with strong academics and the confidence-building promised by MMA. The representations made by MMA were false. There were far too many boys for one drill instructor to supervise. Boys from such a wide span of ages should not have been put together under the same roof.

96.    <u>John Doe 35</u> - (Joseph "Greg" Gasner, mother: Carol Gasner) Plaintiff Joseph Greg Gasner attended summer camp at MMA in 1992 and then attended January 16, 1993 through February 24, 1994. The family chose to send him to MMA because they felt that the structured environment would help him because he had had some minor discipline problems. MMA promised verbally and in written literature that Plaintiff Greg Gasner would be adequately supervised. Instead the barracks were overcrowded with not enough staff being provided. Plaintiff Greg Gasner was

threatened and assaulted, a tooth (molar) was almost knocked out and he got a concussion from a beating that was witnessed by Plaintiff John Trice. This assault occurred in March, 1993, and he was in the infirmary a few days for his injuries. He was given access for the first time to drugs while at MMA. He saw the cadet leadership abusing drugs such as Ritalin and steroids.

97.   <u>John Doe 36</u> - (<u>Brandon Whiddon</u>, mother: <u>Paulette Hawkins</u>, guardian: <u>Patti Tinsley</u>) John Doe 36 attended MMA from August, 1996 until May 16, 1997. The family sent him to MMA because they promised excellence in academics, not because he was a problem child. MMA repeatedly told the family that John Doe 36 was exactly the kind of student MMA seeks to recruit. The family had been told that he would be in a structured, disciplined, and rewarding environment. Rather, he was assaulted by a basketball player on May 12, 1997, who was much larger than him at the direction and with the approval of a basketball coach named Fass. After the assault, the Drill Instructor in charge of John Doe 36 telephoned his grandmother, late at night. He told her that she should call the police. He said that he couldn't call the police, but that John Doe 36 needed medical attention. He told her to call the police as soon as they got off the phone. She immediately called the Harlingen police, and they went to MMA. The officials at MMA said he was fine and had already been looked at by a medic and did not need any further medical attention. However, the police believed his injuries were severe and they took John Doe 36 to the hospital.

98.   <u>John Doe 37</u> - (John Doe 37-B, parents: Dan and Becky Campbell) Plaintiff Doe 37B, Danny Campbell attended MMA during 1995 to 1996. Before the incident of sexual assault involving his brother Jimmy, the family took a trip to MMA, and Danny went with them. While visiting, Mrs. Hager and several other staff members talked to the family about the flight program, telling them that if they enrolled Danny then he would be able to sign up, fly, and get his licence in the first year. These representations were false. The entire staff at MMA neglected to tell the family that there were many reasons that he might not be able to get his license. So the family sent Danny to MMA in expectation of his being able to obtain his pilot's license. He was not allowed to

participate in that program, and while there, he was assaulted, burned with cigarettes by his superior cadet officers, verbally abused, and beaten.

99.    John Doe 38 - (Richard Davis, father: Roe E. Davis, Jr.) John Doe 38 attended MMA from August, 1995 through May, 1996. He chose to attend MMA because he was interested in a career in the military. MMA claimed to have the power of appointment to service academies and that graduation from MMA would generally further their cadets' military careers. The family also chose it for the preparatory aspects, as the family was told by MMA that they had an excellent academic program.    John Doe 38 was assaulted, sexually abused, forced under threat of beatings to scream obscene phrases and simulate oral sex on objects such as flashlights, and "tapped in" with the heels of shoes. This is when the steel points of emblems and badges worn by the student are hit hard by others so they penetrate the flesh of the boy's skull or chest depending on whether the boy is wearing them on the cadet cap or on his chest.    Not only was MMA academically sub-standard, but due to his experiences at MMA,  John Doe 38 now is repelled by the idea of anything further to do with the military.

100.    John Doe 40 - (Robert Hunter, parents: Mr. and Mrs. Joe Hunter) Plaintiff Robert Hunter attended MMA from August 1992 to September 14, 1992.  The family chose MMA after having heard about it from several sources, including ads in Texas Monthly.  They called to inquire about the summer camp.    When they visited the campus, they  were told by staff members, including Gunnery Sgt. Ward, that MMA had an excellent academic program.  They were also told that more national merit scholars came out of there, than anywhere, and more kids went on to service academies.  They were assured that MMA had a highly supervised, structured regimen, and because of the structured environment  Plaintiff Robert Hunter's grades would be improved, his ADD would be controlled, and his overall attitude would get better.  Instead, after summer camp, in the fall semester 1992, within a week or so of his arrival,  he told his parents of several incidents that sounded extreme, like late night "physical training;" doing hundreds of pushups at 1:00 am, being

seen Plaintiff Ryan Stout in a Mexican jail, and that he had begged her to call his family. Plaintiff

Ryan Stout's father called the school immediately, and was informed that no one at MMA knew

where Plaintiff Ryan Stout was. They didn't know he was gone. His father flew down to MMA,

where he was met by Plaintiff Ryan Stout's Drill Instructor Sgt. Roger Rook. His fifteen year old

son was in the Mexican jail for four days. In 1997, Plaintiff Ryan Stout's roommate was beaten up

by other cadets. In September of 1997, Sgt. Maj. Clark began shouting in Ryan's face. He then

began hitting his hard drill sergeant's hat against Ryan's nose trying to provoke him. Ryan's nose

had been operated on twice and Sgt. Clark's assaults with his hat to Ryan's nose was extremely

painful and in violation of the rules in the Right Guide. Ryan finally pushed Clark back to get him

out of his face and off his nose, which gave Clark the opportunity he was seeking to manhandle the

cadet. He pushed Ryan backwards about ten feet. Ryan was severely punished for the episode.

There were further representations made to the Stouts by MMA. At the end of Ryan's year, the

football coach told them that Ryan was one of two boys chosen for a scholarship. Ryan was thrilled

at the honor. However, MMA hired a new coach and the scholarship was not given to Ryan.

104. <u>John Doe 44</u> - (Thomas Mason, parents: Thomas and Sharon Mason) Plaintiff

Thomas Mason attended MMA in the fall of 1995. The family decided to send him to MMA

primarily because he was very interested in the Marines, and the family was given the impression

that MMA was affiliated with the U.S. Marines Corps. MMA was staffed by former Marines. The

family was also told that MMA would provide a structured environment. While he was there, an

incident occurred in which he was directed by an cadet supervisor to point his rifle at another

classmate. The cadet supervisor, in an attempt to humiliate another student, had ordered the entire

class to point their weapons at this student. Plaintiff Thomas Mason refused. He was punished for

his refusal. There was no adult present. Plaintiff Thomas Mason's father had trained him in the use

and handling of firearms, and he was well aware that aiming a weapon at a person was never

permitted. Along with this incident, there were other occasions when Plaintiff Thomas Mason

thrown across the room while asleep; being urinated on, along with his possessions, like his canteen. After he told his DI, in Alpha Company, he was "punished" by being made to stand outside at attention at 1:00 am, until finally, it was announced to the group that he must have urinated on himself. D.I Ward also slapped Robert several times and threw him across a room. Although he called and told the family the things that had happened, the family was told by his Drill Instructor not to believe what Plaintiff Robert Hunter was telling them. He ran away several times and finally slit his wrist because the family and the Drill Instructor refused to believe him when he told them of the incidents that happened to him. He hoped he would be dismissed for slitting his wrist. Later, Dr. Stidevant of a Brazos psychiatric clinic, told the family that he had used that as his last resort, in order to get himself out of a hellish situation. Dr. Elizabeth MacNaughton, from Houston, did a three-day evaluation, told the family that MMA was the worst possible place to have enrolled him with ADD. Not only that they had misrepresented the amount of supervision, they were aware that he had ADD, and as Dr. MacNaughton put it, they had been in the business long enough to know that it was not a good choice in terms of the ADD. MMAs' verbalized theory, was that ADD did not really exist, but that the kids just needed an "attitude adjustment." They have one answer for everything, corporal punishment, which was not what the literature said, and not what the family would have chosen.

101.  <u>John Doe 41</u> - (Joshua Campbell, mother: Teresa Campbell) Plaintiff Joshua "J. R." Campbell, deceased, attended MMA from August 14, 1995 through November 5, 1997. The family chose MMA because his cousin Plaintiff Sam Campbell was going to go there and the family thought the boys would benefit from the structured environment. While he was at MMA, he was given access to drugs and alcohol. He witnessed assaults and violence and was also victim of it. When Cadet Cortez had his throat cut in October, 1997, J. R. was helping him. He saw the blood everywhere and tried to hold Cortez' throat together with his hand until Sgt. Pruitt made him go to his room. He was very scared that night and pushed the desks against the doors. During the first

days after the Cortez incident, the school cut off contact with the parents, and families could not reach students. Plaintiff Joshua Campbell had to sneak out to a phone to let his mother know he was okay. After the family talked with him, it became obvious that MMA was an unsafe and unhealthy environment, and he was withdrawn

102.    **John Doe 42**- (Jeffrey Snider, father: Mark Snider) John Doe 42 attended MMA the summer of 1997. He attended the MMA summer camp, and while he was there, he was the victim of abuse by other boys at the camp, including his cadet instructor. When the family called to check on him, they were misinformed as to the conditions their son was in. John Doe 42 wrote that he had been hit in the genitals, threatened, and was very afraid. He told his family the blows had been severe enough to cause bruising in the area. The family called MMA many times before getting any response from MMA. When the family finally was able to talk to MMA, they did acknowledge the incident. They said they were aware of it and that there would be a hearing on the matter. The Cadet Instructor was moved to another barracks and demoted. Later, the family found out that MMA had no record of the incident. The family didn't get to talk to John Doe 42 at that time, but MMA claimed he was perfectly fine and that everything was okay. After he got home, he told his family about the abuse and assaults, and they chose not to send him back for the regular school year, even though the family had already paid for part of it.

103.    **John Doe 43** - (Ryan Stout, father: Earl Stout) Plaintiff Ryan Stout attended MMA from August 1995 to May of 1997. He was placed at MMA because the family was assured, by representatives of MMA, that he would be in a structured, highly supervised environment. The family was worried about the proximity to Mexico. When Plaintiff Ryan Stout's father specifically asked if there was any chance Plaintiff Ryan Stout would be able to get to Mexico, he was told that it would be impossible for any cadet to go to Mexico. In November, 1995, Plaintiff Earl Stout was shocked when he received a telephone call from a Mexican National, in Mexico. The lady who called Plaintiff Ryan Stout's father spoke little English, but enough to let him know that she had

witnessed violence at MMA. He was exposed to an abusive environment. MMA did not have

enough adult supervision for the number of boys that were under each adult supervisor, or Drill

Instructor. His father likens the situation to the *Lord of the Flies*, or like the inmates running the

asylum, which was a very different situation than was described to the family. They were assured

repeatedly during an orientation given by MMA that there would be no abuse or hazing at MMA.

105.    **John Doe 46** - (Layne Floria, father: Sherwood Floria) Plaintiff Layne Floria

attended MMA from August, 1996 to May, 1997. The family chose to send him to MMA because

he was very active in the JROTC program at his high school. He was a member of the High School's

Varsity Rifle Drill Team. Before he went to MMA, he was very enthusiastic about everything

connected with the military, especially the Marines. After his experiences at MMA, he is repulsed

by the idea of anything to do with the military. At MMA, he was struck and knocked down by a

Drill Instructor. He was exposed to an environment in which there was a lack of adult supervision.

The family was not kept informed of his academic status, his grades, or other pertinent information.

The family was invited to participate in fund raising events for school materials such as alarms for

the dorms and a new student center. The alarms should have been installed, regardless of donations

made, and the student center was built, amid much publicity, but the Plaintiff parents later found

out only because the former student center had been condemned.

106.    **John Doe 47** - (Kenneth Kruckenberg, mother:  Laurie Abajian) John Doe 47

attended MMA in the fall of 1998. John Doe 47's mother sent him to MMA because they were

looking for a strong academic environment. He is not a problem child, and he was not sent there for

any discipline problems. Prior to signing the contract, numerous misrepresentations were made to

John Doe 47's mother. MMA fraudulently concealed that they were currently being sued by over

forty former cadets and their families at the time she signed the contract. Also after signing the

contract, she has found out more things which were fraudulently concealed from her, such as: John

Doe 47's mother sent him to MMA because he has always wanted a career in the Marines and MMA

led her to believe that it was affiliated with the United States Marine Corp. While considering MMA, John Doe 47's mother was sent a brochure. This brochure contained all of the MMA literature, the Marine's emblem is displayed in this brochure and the Iwo Jima statute is promoted. On page 9 of the brochure, is discussed the MMA Traditions, "that have made the Marines unique since 1775. They're also the functions that provide the model for the Corps of Cadets at the Marine Military Academy." John Doe 47's mother learned later that the Marines did not sponsor MMA. John Doe 47's mother was also looking for a strong academic environment for him. He was not a problem child, and he was not sent there for any discipline problems. However, physical punishment and intimidation was the norm at the school although the brochure, again on that same page, represents the following: "Important: It should be firmly emphasized that intimidation is not a method of instruction at the Marine Military Academy and never will be." While at MMA, John Doe 47 was in a military science classroom where Drill Instructor Roger Rook, took a gun, loaded it with live ammunition, put it on his desk and told the boys he would blow the head off the first boy who fell asleep in his class. He continued on, using larger guns and larger ammunition for each consecutive class, until he came to the end, and told them that he really would do it, because all that would happen to him would be that he'd be put back on his medication. The brochure further fraudulently represented that: "No hazing is permitted and the response to any violation is severe disciplinary action." John Doe 47 was threatened, harassed, verbally abused, and assaulted while at MMA. The violence at MMA was a reality and created real fear in John Doe 47 while at MMA. The brochure also misrepresented that: "No drugs, no alcohol, no tobacco *at any time*." John Doe 47's mother was also verbally told by MMA representatives that the school had a zero tolerance as to drugs. John Doe 47 had not willingly been exposed to drugs before, in fact he had left social functions when there was any type of drug use. However, at MMA his headmate was a boy who was undergoing withdrawal from Cocaine.

The tuition refund policy sets parents up to lose a lot of their money: After notifying the

school she would be withdrawing her son, John Doe 47s' mother got a phone call from Tee Recore

in admissions, telling her that John Doe 47 did not want to leave MMA. She asked to speak

personally with him, and John Doe 47 assured her that was not the case. He told her he did want to

leave MMA. Contact between parents and children is prohibited for three weeks, after which time

parents find out what is going on, and after three weeks, the refund amount allowed drops

dramatically. In the case of John Doe 47's family, they paid $9,675 for tuition, and after three

weeks was only eligible to receive a refund of $2,600 which meant they paid $7,075 for three weeks

at MMA. John Doe 47's DI. Sgt. Krauss, told the kids that he was going to prohibit them from

seeing their parents on that "plebe" graduation, when John Doe 47 objected he was punished.

107.    **John Doe 48** - (Cameron Nelson, mother: Sandra Knoll) John Doe 48 attended

MMA part of the fall of 1998. He was sent to MMA because the family felt he could benefit from

strong male role models of honor and integrity, as his mother is a single parent. While at MMA, he

was in a classroom where a teacher took several guns, loaded them, cocked them, and threatened the

class with them. He told them that their parents would pay for the bullets. MMA represented to the

family, in writing, that intimidation was not used on the boys. John Doe 48 was verbally abused,

harassed, threatened, and assaulted. His mother visited the grounds after "plebe" graduation, and

saw boys in the barracks running around unattended. John Doe 48 told her that many kids there

used drugs. He said he had taken the screws out of his bathroom window so that if other cadets

locked him in, he could get out. He ran away, and returned on his own shortly after going to MMA.

His mother decided to withdraw him after she returned home from that visit. She

notified MMA by phone, e-mail and fax. Afterwards, they claimed that they had expelled him, and

therefore she was entitled to less of a refund.

108.    **John Doe 49** - (Daniel Wrider, mother: Florida Rose Wrider) John Doe 49 attended

MMA from the summer of 1992 through the fall of 1993. The family placed John Doe 49 at MMA

because it had been represented to his parents that MMA would provide excellent academics,

discipline and supervision.   While attending MMA, John Doe 49 was subjected to at least two blanket parties, hazed by other cadets in leadership (ie. "Tapping in"), spit on, dehumanized, and locked in the locker-closet in his room.   On one occasion he was locked in his closet, from the outside, for approximately four hours.   During that four hours, other cadets would come by the outside of the locker-closet and spray cans of deodorant in the slats of the closet, making it very difficult for John Doe 49 to breathe. John Doe 49 told his mother that drugs and alcohol ran rampant at MMA, and because of all the representation MMA had made to his parents as to the supervision, zero tolerance, desperate attempts for the new students to make up stories to be sent home, etc., his parents did not believe him. John Doe 49 later became involved in the drugs and alcohol on campus. Prior to MMA John Doe 49 had never taken drugs, drank alcohol or had problems with the law. Since MMA, JOHN Doe 49 has been depressed and has struggled to be a productive member of society.   MMA neglected to supervise John Doe 49 as well as many other cadets on campus, and as a result of the lack of supervision, John Doe 49 along with other cadets ventured into Mexico. MMA failed to advise his parents of his leaving campus without permission and going to Mexico, until after he was returned to MMA, by MMA personnel, after picking him up from the local Police Department.   One of the cadets that went to Mexico with John Doe 49 was never returned to the MMA Campus and has never been seen or heard from again by John Doe 49.   John Doe 49 was expelled from MMA after the last Mexico trip and his parents were never offered a refund of any of the prepaid tuition. John Doe 49 witnessed assaults and hazing of other cadets, including an incident where an minor cadet was attacked by cadets in leadership with a cattle prod.

109.   John Doe 50- (Scott Navarre, father: John Navarre) John Doe 50 attended MMA from August, 1996 to the fall of 1996 (a total of nine weeks).   Prior to attending MMA, John Doe 50's parents were searching for a supervised and disciplined academic environment for their son. John Doe 50 had a friend that was about to attend MMA and he expressed interest in the school. After reviewing information provided by MMA and speaking with the admissions office, John Doe

CVAPDF - www.fasoka.com

50's parents had the following representations made to them: "we help boys like Scott"; No alcohol or drugs are tolerated; supervised environment, etc. John Doe 50 was accepted and his parents paid the entire tuition up front. Within the first month of attending MMA, John Doe 50 went off campus all weekend unsupervised with another cadet. His parents were never informed. Upon returning late to campus, the entire company was punished and made to sleep on the floor of the laundry room that night. During that punishment, all the cadets except John Doe 50 smoked marijuana. The following morning John Doe 50 reported the drug use to his Drill Instructor, Sgt. MOR. Rick Hughes. Death threats and retaliation began almost immediately. John Doe 50 was subjected to physically attacks, including blanket parties, where he was beaten until he was unconscious. The parents were never informed. John Doe 50 became increasingly depressed and as a result, was seen by an MMA psychologist and was placed on antidepressants, all without the knowledge and permission of his parents. John Doe 50 was so depressed and in fear for his life that he ran away from MMA Campus and returned home.

110.   **John Doe 51 (Sean Fagan, Mother and Father - Peter and Pamela Fagan).** John Doe 51 attended the summer program of 1998 and attended the fall semester in August, 1998 until December, 1998. John Doe 51's father checked out MMA and was told by Col. Hill and Col. Myers what a great place it was for their son. The family was given the impression that MMA was affiliated with the U.S. Marine Corps. MMA was staffed by former Marines. The family placed John Doe 51 at MMA because it was represented to his parents that MMA would provide excellent academics, discipline and supervision. John Doe 51's parents took out a second mortgage on their house in order to give their son a "wonderful" and productive" junior year. It turned out to be a nightmare.

John Doe 51's mother talked to Msgt. McLaughlin for a long time asking him questions as to the policies of the school. He said that it was a "perfect school for a kid who needed structure," that the boys were fully supervised, that the upperclass cadets were the "cream of the crop,"-that there

Arbini was on unsupervised leave in Harlingen, Plaintiff Arbini was picked up by two adult males. He was enticed to their apartment with the promise of beer, girls and a party. While he was there, the two adults forced him to perform sex acts against his will. After he escaped and returned to MMA by taxi, he reported the crime to his drill instructor, Sgt. Jim Hager and Col. Hobbs. He was told by Col. Hobbs and Sgt. Hager not to report the crime. However, after talking with cadet Adam Rekerdres, Plaintiff Arbini did make the report to the Harlingen Police Department. He was stigmatized by the personnel of MMA by having to ride, in a clandestine manner, in the back of the van which delivered him to the psychological counseling in Harlingen recommended by MMA. He was made to feel like the attack had been his fault.

While attending MMA, John Doe 52 was subjected to hazing and was assaulted on numerous occasions. On one occasion, on approximately May 17, 1996, Plaintiff Joseph Arbini was assaulted by Cadet Sgt. Charles George, Cadet Urano and other cadets. Each of them hit Arbini in the stomach and chest, numerous times. Cadet Sgt. George forced Plaintiffs Joseph G. Arbini and Peter Villano to eat an entire packet cigarettes, including package itself, to make them vomit. When this failed, Cadet George compelled Arbini and Villano to spin around and around in another attempt to induce vomiting. When Plaintiff Vigliano threw up after being spun around repeatedly, he was forced to roll up his vomit into a ball and eat it. This procedure was also applied to Arbini in order to induce the same reaction. When Arbini could not throw up, he was sprayed with a water hose by George. After Vigliano was released, George and the other cadets continued to assault Arbini for two more hours. George then threw Arbini into a brick wall several times and stated he would kill him if he told anyone what he had suffered. Arbini, in fear of his life, fled MMA and never returned. For about two days Arbini hid in a field until he turned himself into the Combes Police Department. He has suffered serious mental anguish in the past which continues to this day because of the horrible things that happened to him while he was a student and under the control of MMA. Plaintiff Jerrold Arbini has suffered severe mental anguish over these events as well. He felt betrayed and felt

was supervised study time, and that MMA had a "zero tolerance" as to drugs and alcohol. He further promised that MMA "never accepted a kid with a criminal background." He told her not to read the letters or communicate with her son for over a month. When MMA knew the 20/20 story about the school was going to run, they assured parents that it painted an untrue picture. Plaintiff parents received e-mails from other parents saying that these were all bad boys that brought the lawsuit, that most the incidents depicted did not happen and that the ones that did (Cortez) were isolated incidents. The family did not know what to believe, but were urged to trust MMA. Then Sean told her that the cadets put choke holds on each other until they passed out. John Doe 51's mother called the new commandant and started crying because of her concern. He assured her that he would take care of it. An investigation was made of the allegations and the perpetrators were expelled from MMA according to Hager. So the parents felt relieved and were convinced to allow their son to stay. Every time John Doe 51's mother called MSgt. Hager with her fears, Hager would call her son in and belittle him, telling him things like: "If your mom loved you, you wouldn't be here." John Doe's mother was relieved when her son was moved to Charlie Company. She found out later from her son that this company was very rough and had numerous former gang members in it. Shortly after that, in December of 1998, their son was a victim of a "blanket" party. A

vertebrae in his back was fractured as a result of this blanket party when a cadet jumped on him. This injury continues to give him problems today. The parents of John Doe 51 feel very betrayed by this school and have had their relationship with their son damaged as a result of it.

111.    **John Doe 52** - (Joseph G. Arbini, father: Jerrold E. Arbini)  John Doe 52 attended MMA during the school year of 1996. The family placed John Doe 52 at MMA because the staff had represented to the Arbinis that MMA would provide excellent academics, discipline and supervision. These representations were false and their son was injured as a result of the lack of supervision. Further, these misrepresentations were made knowingly to Plaintiff Jerrold Arbini by Defendant MMA and its agents. On approximately April 20, 1996, while 16 year old Plaintiff Joseph

anguished that his son had suffered such humiliating mental and physical pain.

The acts by the defendants have and will continue to cause severe psychological pain and suffering and substantially impaired relationship between the father and son, which could be irreparable.

112.    **John Doe 53** - (Shannon T. Lambert, father: Troy Lambert)  John Doe 53 entered MMA at the mid-term in January of 1997.  In November of 1996, the family attended a recruiting meeting in Houston.  In December of 1996 they made a visit to Harlingen for a tour of the campus. Shannon had always been a polite, respectful boy who had received the honor of being in "Who's Who Among American High School Students."  He was involved in church and "Young Life."  The family placed Shannon at MMA because the staff had represented to them that MMA would provide excellent academics and supervision.  These representations were false and their son was terrorized as a result of the lack of supervision.  Further, these misrepresentations of the goods and services provided by MMA were made knowingly to Plaintiff Troy Lambert by Defendant MMA and its agents.

In February of 1996, Shannon began begging his parents to let him come home.  He said the school was one of the biggest drug-dealing campuses he had ever heard about and the academic achievements were a farce due to the non-challenging courses.  He told them about his drill instructor, Sgt. Jim Hager, who had been in Vietnam and had flashbacks, during which he would walk down the halls of the barracks with a baseball bat hitting things.  He once smashed a boys radio for playing it too loudly.  Shannon once left the campus and went to the Harlingen Airport trying to get the nerve to fly home, but he knew how disappointed his parents would be if he quit.  Shannon became physically ill and could not eat.  Once when he was visiting with his family one weekend, he started shaking before he was to return to MMA.  The parents had been warned in a letter from MMA that the boys would tell tales to get out of MMA and that the parents were not to put any credibility in any complaints they heard from their sons.  On February 26, 1997, the Lamberts

received a call from Shannon asking if he could come home. He said he was either challenged or challenged other cadets to settle differences in supervised fighting matches several times a week. The anger and frustration Shannon had at MMA made him want to hurt someone. Shannon refused to return from his home visit ending March 3rd, he said he would live alone rather than go back to MMA. Mrs. Lambert wrote to MMA requesting a parent release, so they would be able to get a transcript. Shannon still has not recovered from this experience and did not complete high school. The parents realized that sending Shannon to MMA was the worst decision they could have ever made for him. He still has sleeping problems due to this experience. Broken dreams and a broken spirit are what Shannon lives with today.

## IV.
## CAUSES OF ACTION AGAINST DEFENDANT MMA

113. Plaintiffs' damages were proximately caused by the acts or omissions of Defendant MMA. These acts of omission include the following:

1. Negligence;

2. Negligent misrepresentation;

3. Deceptive trade practices;

4. Negligent endangerment to minors;

5. Negligent supervision resulting in hazing;

6. Negligent supervision of Plaintiffs' and staff;

7. Negligent selection, hired or continued employment of Drill instructors;

8. Breach of fiduciary duty;

9. Fraudulent concealment;

10. Negligent providing access to alcoholic beverages to minors in violation of Section 106.06 of the Texas Alcoholic Beverage Code;

11. Negligence in providing access to controlled substances to minors in violation of Section 481.122 of the Texas Health and Safety Code;

12.     Negligent misrepresentation involving risk of physical harm pursuant to the Restatement (Second) of Torts, Section 311;

13.     Fraud; and

14     Failure to report to Child Protective Services.

## V.
## COUNT ONE - NEGLIGENCE

114.    The conduct of the Defendant MMA, as described herein, constitutes negligence and/or negligence per se:

1.     Failing to employ enough employees to provide adequate adult supervision of cadets;

2.     Failing to employ adequate security measures for the safety of the cadets;

3.     Failure to promulgate policies which encourages and requires the prevention of physical abuse including hazing, sexual assault and physical assault;

4.     Failing to report sexual abuse and/or assault;

5.     Failing to employ qualified and sufficient personnel including counselors to supervise Marine Military Academy cadets;

6.     Negligent retention of personnel;

7.     Negligently permitting upperclassmen and/or officers (students) to supervise, operate, and run Marine Military Academy and its' cadets on a day to day basis;

8.     Failing to employ procedures to investigate promptly, fairly, and adequately complaints by students; and

9.     Permitting cadets with prior instances of infractions of sexual and physical assault to remain at Marine Military Academy and/or supervise other cadets.

10.    Failing to adequately provide medical care to Plaintiffs, to advise Plaintiff parents of medical conditions of their Plaintiff sons and to obtain proper authorization for medical treatments of them.

11.    Failing to inspect, discover, and correct the unsafe conditions at MMA;

12.    Failing to warn Plaintiffs of the unsafe conditions at MMA

13.    Failing to heed the recommendations of the Self-Study and the SACS committee in 1994.

Each of the foregoing acts and/or omissions constituted negligence and each proximately caused the injuries and damages sustained by Plaintiffs.

## VI.

## COUNT TWO - NEGLIGENT MISREPRESENTATION

115.    Paragraphs 1 through 114 are re-alleged and incorporated herein for all purposes. Plaintiffs would show that Defendant MMA, in the course of its business and through its agents, or in the course of business in which it had a pecuniary interest, and Defendants Maj. Gen. Harold. Glasgow, Lt. Col. G. D. Andresen and Col. T.A.Hobbs, supplied false and misleading information to Plaintiffs by which Plaintiffs were guided in the business of entering into a contract with MMA. In supplying such false and misleading information to Plaintiffs, Defendants failed to exercise reasonable care in communicating the information, Plaintiffs suffered pecuniary losses, physical and emotional injuries as a result of MMAs' negligent misrepresentation for which Plaintiffs have sued. The facts summarized above enumerate the breaches of duty by Defendants.

## VII.
## COUNT THREE - DECEPTIVE TRADE PRACTICE CLAIM

116.    Paragraphs 1 through 115 are re-alleged and incorporated herein for all purposes. Plaintiff - Parents were purchasing good and services from Defendant MMA. Plaintiffs would show that Defendant MMA and Defendants Maj. Gen. Harold. Glasgow, Lt. Col. G. D. Andresen and Col. T.A.Hobbs, personally, and others acting at their direction or control violated Tex. Bus. & Com. Code Ann. § 17.46, et seq., known as the Texas Deceptive Trade Practices Act, in the following respects:

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following    acts: . . . .

(1) Passing off goods or services as those of another;

(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of . . . services;

(3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) using deceptive representations . . . in connection with . . . services;

(5) representing that . . . services have sponsorship, approval, characteristics, benefits, . . . which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not; . . . . .

(7) representing that . . . services are of a particular standard, quality . . ., if they are of another;

(8) advertising . . . services with intent not to sell them as advertised.

(23) the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

Tex. Bus. & Com. Code Ann. § 17.46.

117.   Defendants knew the problems of the institution; its weaknesses and its pretenses. But, had Defendants disclosed these to the parents of prospective students, the Plaintiff-Parents would not have entered into the contracts they did with MMA. The parents were deceived into thinking that the school was affiliated with the United States Marine Corps when it was not. To perpetrate this deception, the school used United States Marine Corps representations in various overt ways and, in so doing, purported to have a connection to the United States Marine Corps which it did not have, beyond simply having a JROTC program at the school. These actions were done knowingly and intentionally and damaged the families of this cause. The Defendants conduct was unconscionable and took advantage of them to a grossly unfair degree and this practice was to the Plaintiff-Parents detriment.

## VIII.
## COUNT FOUR - NEGLIGENT SUPERVISION OF PLAINTIFFS AND STAFF

118.   Paragraphs 1-117 are re-alleged and incorporated herein for all purposes. Plaintiff would state that Defendant, MMA failed to supervise the cadets under their charge, allowing the physical and sexual abuse and hazing of Plaintiffs, as specifically referenced above. Defendant,

MMA also failed to supervise its employee Drill Instructors who either participated in or allowed the physical or sexual assault of Plaintiffs.

119.   Plaintiffs would show that the acts or omissions of Defendant MMA or its employees constituted Hazing offenses as defined by the Texas Educational Code , Section 37.151 et. seq. These hazing offenses, including failure to report hazing and failure to promulgate adequate or appropriate hazing policies, constitute negligence per se under Texas law. General Glasgow was informed personally of these dangers in December, 1995, with a letter from a parent telling him of the assaults that took place at night in the barracks of MMA. General Glasgow disregarded the information and the safety of the children in his charge.

120.   Plaintiffs would show that Defendants violated the Texas Endangerment of Minors Statute by placing children under 15 years old in danger and exposing these minors to an unreasonable risk of harm. Defendants had a duty of "care, custody, or control" of minor boys, and put those boys "in circumstances in which no reasonable, similarly situated adult would leave a child of that age and ability". In other words, leaving a small 12, 13 or 14-year-old boys unsupervised to be sexually and physically preyed upon at night in a dormitory by larger, older boys, with no protection, is to leave those boys "under circumstances which no reasonable, similarly situated adult would leave a child of that age and ability." Physical and emotional harm were caused to the Plaintiffs as a result. General Glasgow was informed personally of these dangers in December, 1995, with a letter from a parent telling him of the assaults that took place at night in the barracks of MMA. Defendant, General Glasgow disregarded the information and the safety of the children in his charge. Such violation of the Child Endangerment Statute constitutes negligence per se for which MMA and Defendant Glasgow are liable.

121.   All Defendants, including the Trustees on the Board, were negligent in failing to follow the recommendations of the Self-Study performed by Defendant MMA, including its officers and trustees, which specifically recommended that MMA "provide additional Drill Instructor

assistance to enhance overall supervision of Cadets throughout the each day." MMA, its staffs, officers, and Trustees also disregarded the recommendations of the SACS committee after their visit in April of 1994, which specifically recommended assistant Drill Instructors, so the D.Is could have some form of "Off Time." The committee stated the assistant drill instructors "can also assist in providing a quiet environment for rest between the hours of 2200-0600." Therefore, Defendant MMA and the Board of Trustees, are liable for the acts or omissions of its Drill Instructors and other staff because of their negligence in not providing more supervision and under the doctrine of Respondeat Superior.

## IX.
## COUNT FIVE- NEGLIGENT SELECTION OR RETENTION

122.    Paragraphs 1 through 121 are re-alleged and incorporated herein for all purposes. Defendant , MMA was negligent in its selection or retention of its employee Drill Instructors who either participated in or allowed the physical or sexual assault of Plaintiffs.  MMA continued to employ individuals whom it knew or should have known were dangerous to young boys.  MMA is liable for the acts of its employees or agents under the Doctrine of Respondeat Superior.

## X.
## COUNT SIX - BREACH OF FIDUCIARY DUTY

123.    Paragraphs 1 through 124 are re-alleged and incorporated herein for all purposes Defendant MMA, Glasgow, Hobbs and Andreson,  owed the Plaintiffs and their parents the highest duty of trust and confidence and were required to act in the Plaintiffs best interests.  The Plaintiffs-parents entrusted their most precious sons to the Defendants' care for an excellent education, room and board, food,  security from emotional and physical harm and  guidance.  The Plaintiffs-Parents were led to believe that the relationship between MMA and their sons and themselves was a special or confidential relationship akin to a surrogate parent  in which MMA  had a duty and responsibility to deal with the Plaintiffs-Sons or to act on the Plaintiffs-Sons behalf with the highest degree of trust, confidence honesty, utmost good faith and loyalty.  The Plaintiff-Parents necessarily trusted and

relied on the belief that MMA would not allow or direct the emotional and physical injuries be inflicted upon the children pledged to its care. MMA breached this confidential and special relationship by violating the Plaintiffs' trust in directing others under MMA's control to act or by failing to act to prevent the sexual abuse, physical abuse, emotional abuse or hazing of Plaintiffs-Sons. These acts or omissions proximately caused damages to Plaintiffs.

## XI.
## COUNT SEVEN -FRAUD AND FRAUD IN THE INDUCEMENT

124.    Paragraphs 1 through 123 are re-alleged and incorporated herein for all purposes

Plaintiffs would show that Defendant MMA fraudulently induced the Plaintiff parents into entering into contract agreements without revealing pertinent and material facts. MMA acting in concert with the others known and unknown to Plaintiffs, systematically engaged in an active pattern of fraud and deceit upon which the Plaintiffs and their families relied to their detriment, in entering into their contract with MMA. This fraud was perpetrated upon Plaintiffs by the Defendants MMA, recruiters for MMA, Defendants Andreson, Hobbs and Glasgows' misrepresentation, concealment or failure to disclose the toxic environment which existed at the school of which these Defendant's had special knowledge which Plaintiffs did not. Plaintiffs would show that Defendant MMA fraudulently induced them to send their sons to MMA while they fraudulently concealed the extent and nature incidents of physical abuse sexual abuse and hazing perpetrated on cadets and the failure to report such acts as required by law to Child Protective Services and other official agencies of the State. In particular, this fraud included the cover-up and misrepresentations of incidents of physical, emotional and  sexual abuse of cadets and failure to report such acts as required by law to Child Protective Services and other official agencies of the State. These misrepresentations and fraudulent conduct of promoting MMA as a healthy environment for a child was done with the knowledge of its falsity by Defendants or made recklessly without any knowledge of the truth and as a positive assertion. These misrepresentations as to the character and caliber of this school were made with

the intention that Plaintiffs-parents act on these misrepresentations enrolling and keeping their sons at MMA. This fraudulent conduct, misrepresentations and failure to disclose injured Plaintiffs and their sons. Defendants surreptitiously sent a number of cadets to a psychiatrist named Dr. Anthony Ramashwar and other physicians contracting services to MMA, to be treated for the traumas caused by the physical and sexual assaults, often without the knowledge or authorization of the Plaintiff-Parents.

## XII.
## COUNT EIGHT - NEGLIGENT PROVIDING MINORS ACCESS TO ALCOHOL

125.    Paragraphs 1 through 124 are re-alleged and incorporated herein for all purposes

Defendant MMA by providing access to alcoholic beverages to the Plaintiffs when they were minors in violation of Section 106.06 of the Texas Alcoholic Beverage Code. Such violation of this statute constitutes negligence per se.

## XIII.
## COUNT NINE - NEGLIGENT PROVIDING
## ACCESS TO CONTROLLED SUBSTANCES

126.    Paragraphs 1 through 125 are re-alleged and incorporated herein for all purposes Defendant MMA by providing controlled substances and access to controlled substances to the Plaintiffs when they were minors in violation of Section 481.122 of the Texas Health and Safety Code. Such violation of this statute constitutes negligence per se. Defendants surreptitiously sent cadets, to a psychiatrist named Dr. Anthony Ramashwar, contracting services with MMA, to be treated for their traumas caused by the physical and sexual assaults. That physician prescribed psychotrophic drugs to several of the cadets without the knowledge or consent of their parents.

## XIV.
## COUNT TEN - FAILURE TO REPORT TO CHILD PROTECTIVE SERVICES

127.    Paragraphs 1 - 126 are re-alleged and incorporated herein for all purposes. Defendant MMA either failed to timely report or failed to report child sexual abuse to the authorities as required by law pursuant to the Texas Reporting Statute, Article 695c (2) §2 et seq., Vernon's Ann. Civ. St.

Such violation of Texas law constitutes negligence per se for which Defendant MMA is liable.

128.     Defendants breached their duty to protect the privacy of the minor children in their charge, who are Plaintiffs and in doing this they violated the Family Educational Rights and Privacy Act (FERPA). Such violation of FERPA constitutes negligence per se for which Defendant MMA is liable.

## XIV.
## COUNT ELEVEN - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

129. Paragraphs 1 - 128 are re-alleged and incorporated herein for all purposes. Plaintiffs allege that the actions of these Defendants have intentionally inflicted emotional distress upon the Plaintiffs. In the above-alleged facts Defendants MMA, their agents acted intentionally or recklessly; their conduct was extreme and outrageous; and the actions of Defendants caused Plaintiffs emotional distress; and the emotional distress suffered by Plaintiffs was severe.

## XV.
## COUNT TWELVE - INTENTIONAL/NEGLIGENT
## SPOLIATION OF DOCUMENTS & EVIDENCE

130.     Paragraphs 1 - 129 are re-alleged and incorporated herein for all purposes. Defendant MMA had a fiduciary duty to maintain accurate and truthful records of the cadets in their charge and the activities surrounding the operation of MMA. Defendant under a court order to disclose and produce all of the records of the Plaintiffs' in this cause, who were formerly cadets at MMA. Defendant has intentionally and/or negligently destroyed or illegally withheld documents which were ordered by the court for them to produce.    Plaintiffs request the court issue proper sanctions, including presuming all things are against MMA (omnia praesumuntur contra spoliatorem — all things are presumed against a despoiler.)

## XVI.
## DAMAGES FOR JOHN DOES

131.     **Common Damages for John Does:**

A.     As a result of the conduct and incidents described herein, Plaintiffs have

133.   Plaintiffs plead delayed discovery of their claims against Defendants despite the exercise of reasonable diligence on their part, thus tolling the statute of limitations.

134.   Plaintiffs plead delayed discovery of the harm caused by physical abuse by Defendants or due to their negligence and the delay in treatment despite the exercise of reasonable diligence on their part, thus tolling the statute of limitations.

135.   Plaintiffs plead fraud and fraudulent concealment of this fraud on the part of Defendants, thus suspending the running of limitations as to all claims.

136.   Plaintiffs plead fraudulent concealment of facts under Defendants' control giving rise to a cause of action against all Defendants, thus suspending the running of limitations as to all claims.

137.   Plaintiffs plead breach of fiduciary duty, including the duty to disclose, against all Defendants, thus suspending the running of limitations as to all claims.

138.   Plaintiffs plead a concert of action, a conspiracy to conceal negligence, to commit fraud and to fraudulently conceal the acts and the existence of the fraud and conspiracy, thus suspending the running of limitations as to all claims against Defendants.

139.   Plaintiffs allege that the actions of the Defendants have caused them to suffer an unsound mind, thus suspending the running of limitations, pursuant to Section 16.001 of the Texas Civil Practice and Remedies Code.

140.   Plaintiffs allege that the actions of all Defendants, because of their conduct, statements and promises, preclude them from claiming a bar of limitations to any of Plaintiffs' claims.  Plaintiffs thus plead the doctrine of Equitable Estoppel.

## XIX.
## PRAYER

141.   FOR THE REASONS STATED ABOVE , Plaintiffs pray  that they be  awarded all damages plead , including actual compensatory and punitive damages.  Plaintiffs seek a judgment against all  Defendants, jointly and severally.  Plaintiffs also seek attorneys' fees, interest as allowed

Code Ann. § 17.50 (d)(DTPA) and Tex. Civ. Prac. & Rem. Code § 38.001.

I.      Plaintiffs herein claim interest in accordance with Texas Finance Code

§304.001 *et seq.* and pre-judgment and post-judgment interest in accordance with Article 5069-1.05

of V.A.T.S. and any other applicable law.

J.      Plaintiffs request a jury of their peers hear this case and , that Plaintiffs have

judgment against Defendants, jointly and severably, for all damages pled as described herein, for cost

of suit, attorneys fees, interest as allowable by law and for such other relief to which Plaintiffs may

be justly entitled.

## XVII.
## COMMON DAMAGES FOR PARENTS OF JOHN DOES

132.    Damages for the parent(s) of John Does:

A.      The Plaintiff-Parents of the John Does, as a result of the incidents described

herein, have incurred medical and counseling expenses in the past which were reasonable and

necessary and in all reasonable probability such expenses will continue in the future.

B.      The Plaintiff-Parents of John Does have incurred attorneys' fees and request

reasonable attorneys' fees as allowed by law, specifically: Tex. Bus. & Com. Code Ann. § 17.50

(d)(DTPA) and Tex. Civ. Prac. & Rem. Code § 38.001 to be awarded in this cause.

C.      The Plaintiff-Parents of John Does have incurred out of pocket expenses and

tuition costs based on Defendant's misrepresentations for which they seek reimbursement.

D.      The Plaintiff-Parents have suffered mental anguish as a result of the

misrepresentations made by Defendant MMA and from the betrayal. They have felt anguished that

their son had suffered such humiliating mental and physical pain. They have felt further mental

anguish from the estrangement that Defendant MMA has caused between the Plaintiff-Parents and

their sons.

## XVIII.
## STATEMENTS TO THE COURT

incurred medical and counseling expenses in the past which were reasonable and necessary and, in all reasonable probability, such expenses will continue in the future.

B.     Plaintiffs have experienced severe psychological pain and suffering in the past and, in all reasonable probability, will sustain severe psychological pain and suffering in the future as a result of his psychological injuries.

C.     Plaintiffs have suffered mental anguish in the past and, in all reasonable probability, will sustain mental anguish in the future.

D.     Plaintiffs have suffered many other damages including loss of self esteem, loss of trust and in all reasonable probability their social and professional adjustment in the future will be adversely impacted. Further, Plaintiffs' relationship with their parents have been damaged and/or destroyed.

E.     Plaintiffs have suffered a diminished wage earning capacity in the past and, in all reasonable probability, will suffer loss of earning capacity in the future.

F.     As a result of the above, Plaintiffs seek damages in excess of the jurisdictional limits of the Court and seek a judgment against the Defendants, jointly and severably.

G.     Plaintiffs also seek punitive and exemplary damages in order to punish and deter the outrageous conduct of the Defendant. Facts as alleged above, will be proven by Plaintiffs, by clear and convincing evidence, that Defendants acted maliciously in that, either by an act or omission, they exposed Plaintiff-Sons to an extreme degree of risk, considering the probability and magnitude of the potential harm to them. Defendants further had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of the Plaintiff-Sons while they were cadets at Defendant MMA. These damages, in part, were additionally based on conduct described as a felony, specifically Texas Penal Code §22.011 (sexual assault) and §22.04 (injury to a child) and were committed knowingly and/or intentionally.

H.     Reasonable attorneys' fees as allowed by law, specifically: Tex. Bus. & Com.

by law and such other relief by law or in equity as the court deems appropriate.

## XX.
## JURY DEMAND

142.    The Plaintiffs request a trial of this case by jury and have paid the jury fee pursuant

to Rule 216 of the Texas Rules of Civil Procedure.


Respectfully submitted,

LAW OFFICE OF MARY ALICE MCLARTY
Founders Square, Suite 540
900 Jackson Street
(214) 742-4040
(214) 742-4545 fax
Dallas, TEXAS 75202


MARY ALICE McLARTY
State Bar Card No. 13740450

ATTORNEY FOR PLAINTIFFS

Frank Costilla
State Bar Card No. 04856500
Law Offices of Frank Costilla
5 E. Elizabeth St.
P. O. Box 4417
Brownsville, TX 78523-4417
(956) 541-4982
(956) 544-3152 fax

CO-COUNSEL FOR ARBINI PLAINTIFFS


## CERTIFICATE OF SERVICE

I, MARY ALICE McLARTY, do hereby certify that on the *2nd* day of March, 2000,
pursuant to the Texas Rules of Procedure, a true and correct copy of the above instrument has been
sent to opposing Counsel, George J. Petras, IV, Henslee, Fowler & Hepworth, 800 Frost Bank Plaza,
816 Congress Avenue, Austin, Texas 78701, attorney for Defendant MMA.


MARY ALICE McLARTY

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

## DISTRICT OF _____

ALLSTATE INSURANCE COMPANY

**SUMMONS IN A CIVIL CASE**

V.

CASE NUMBER: B‑01‑020 :

A. EARLINE FOLSOM

TO: (Name and address of defendant)

A. Earline Folsom, 2101 Treasure Hills, No. 413
Harlingen, Cameron County, Texas  78550-8715

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Martin J. Phipps of ADAMI, GOLDMAN,& SHUFFIELD, INC.
9311 San Pedro, Suite 900
San Antonio, Texas  78216

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Michael N. Milby, Clerk

1-30-01

CLERK

DATE

(BY) DEPUTY CLERK